Justice Souter
delivered the opinion of the Court.
Liability under § 1 of the Sherman Act, 15 U. S. C. § 1, requires a “contract, combination ... , or conspiracy, in restraint of trade or commerce.” The question in this putative class action is whether a § 1 complaint can survive a motion to dismiss when it alleges that major telecommunications providers engaged in certain parallel conduct unfavorable to *549 competition, absent some factual context suggesting agreement, as distinct from identical, independent action. We hold that such a complaint should be dismissed.
I
The upshot of the 1984 divestiture of the American Telephone & Telegraph Company’s (AT&T) local telephone business was a system of regional service monopolies (variously called “Regional Bell Operating Companies,” “Baby Bells,” or “Incumbent Local Exchange Carriers” (ILECs)), and a separate, competitive market for long-distance service from which the ILECs were excluded. More than a decade later, Congress withdrew approval of the ILECs’ monopolies by enacting the Telecommunications Act of 1996 (1996 Act), 110 Stat. 56, which “fundamentally restructure[d] local telephone markets” and “subjected] [ILECs] to a host of duties intended to facilitate market entry.” AT&T Corp. v. Iowa Utilities Bd., 525 U. S. 366, 371 (1999). In recompense, the 1996 Act set conditions for authorizing ILECs to enter the long-distance market. See 47 U. S. C. §271.
“Central to the [new] scheme [was each ILEC’s] obligation ... to share its network with competitors,” Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U. S. 398, 402 (2004), which came to be known as “competitive local exchange carriers” (CLECs), Pet. for Cert. 6, n. 1. A CLEC could make use of an ILEC’s network in any of three ways: by (1) “purchasing] local telephone services at wholesale rates for resale to end users,” (2) “leasing] elements of the [ILEC’s] network ‘on an unbundled basis,’ ” or (3) “interconnecting] its own facilities with the [ILEC’s] network.” Iowa Utilities Bd., supra, at 371 (quoting 47 U. S. C. § 251(c)). Owing to the “considerable expense and effort” required to make unbundled network elements available to rivals at wholesale prices, Trinko, supra, at 410, the ILECs vigorously litigated the scope of the sharing obligation imposed by the 1996 Act, with the result that the Federal Communications Commission (FCC) three times *550 revised its regulations to narrow the range of network elements to be shared with the CLECs. See Covad Communications Co. v. FCC, 450 F. 3d 528, 533-534 (CADC 2006) (summarizing the 10-year-long regulatory struggle between the ILECs and CLECs).
Respondents William Twombly and Lawrence Marcus (hereinafter plaintiffs) represent a putative class consisting of all “subscribers of local telephone and/or high speed internet services . . . from February 8, 1996 to present.” Amended Complaint in No. 02 CIV. 10220 (GEL) (SDNY) ¶ 53, App. 28 (hereinafter Complaint). In this action against petitioners, a group of ILECs,[1] plaintiffs seek treble damages and declaratory and injunctive relief for claimed violations of §1 of the Sherman Act, ch. 647, 26 Stat. 209, as amended, 15 U. S. C. § 1, which prohibits “[ejvery contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations.”
The complaint alleges that the ILECs conspired to restrain trade in two ways, each supposedly inflating charges for local telephone and high-speed Internet services. Plaintiffs say, first, that the ILECs “engaged in parallel conduct” in their respective service areas to inhibit the growth of upstart CLECs. Complaint ¶47, App. 23-26. Their actions allegedly included making unfair agreements with the CLECs for access to ILEC networks, providing inferior connections to the networks, overcharging, and billing in ways designed to sabotage the CLECs’ relations with their own customers. Ibid. According to the complaint, the ILECs’ *551 “compelling common motivatio[n]” to thwart the CLECs’ competitive efforts naturally led them to form a conspiracy; “[h]ad any one [ILEC] not sought to prevent CLECs . . . from competing effectively , the resulting greater competitive inroads into that [ILEC’s] territory would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories in the absence of such conduct.” Id., ¶ 50, App. 26-27.
Second, the complaint charges agreements by the ILECs to refrain from competing against one another. These are to be inferred from the ILECs’ common failure “meaningfully [to] pursu[e]” “attractive business opportunities]” in contiguous markets where they possessed “substantial competitive advantages,” id., ¶¶ 40-41, App. 21-22, and from a statement of Richard Notebaert, chief executive officer (CEO) of the ILEC Qwest, that competing in the territory of another ILEC “ ‘might be a good way to turn a quick dollar but that doesn’t make it right,’” id., ¶ 42, App. 22.
The complaint couches its ultimate allegations this way:
“In the absence of any meaningful competition between the [ILECs] in one another’s markets, and in light of the parallel course of conduct that each engaged in to prevent competition from CLECs within their respective local telephone and/or high speed internet services markets and the other facts and market circumstances alleged above, Plaintiffs allege upon information and belief that [the ILECs] have entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another.” Id., ¶ 51, App. 27.[2]
*552 The United States District Court for the Southern District of New York dismissed the complaint for failure to state a claim upon which relief can be granted. The District Court acknowledged that “plaintiffs may allege a conspiracy by citing instances of parallel business behavior that suggest an agreement,” but emphasized that “while ‘[circumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy[, . . .] “conscious parallelism” has not yet read conspiracy out of the Sherman Act entirely.’” 313 F. Supp. 2d 174, 179 (2003) (quoting Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U. S. 537, 541 (1954); alterations in original). Thus, the District Court understood that allegations of parallel business conduct, taken alone, do not state a claim under § 1; plaintiffs must allege additional facts that “ten[d] to exclude independent self-interested conduct as an explanation for defendants’ parallel behavior.” 313 F. Supp. 2d, at 179. The District Court found plaintiffs’ allegations of parallel ILEC actions to discourage competition inadequate because “the behavior of each ILEC in resisting the incursion of CLECs is fully explained by the ILEC’s own interests in defending its individual territory.” Id., at 183. As to the ILECs’ supposed agreement against competing with each other, the District Court found that the complaint does not “alleg[e] facts . . . suggesting that refraining from competing in other territories as CLECs was contrary to [the ILECs’] apparent economic interests, and consequently [does] not rais[e] an inference that [the ILECs’] actions were the result of a conspiracy.” Id., at 188.
*553 The Court of Appeals for the Second Circuit reversed, holding that the District Court tested the complaint by the wrong standard. It held that “plus factors are not required to be pleaded to permit an antitrust claim based on parallel conduct to survive dismissal.” 425 F. 3d 99, 114 (2005) (emphasis in original). Although the Court of Appeals took the view that plaintiffs must plead facts that “include conspiracy among the realm of ‘plausible’ possibilities in order to survive a motion to dismiss,” it then said that “to rule that allegations of parallel anticompetitive conduct fail to support a plausible conspiracy claim, a court would have to conclude that there is no set of facts that would permit a plaintiff to demonstrate that the particular parallelism asserted was the product of collusion rather than coincidence.” Ibid.
We granted certiorari to address the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct, 548 U. S. 903 (2006), and now reverse.
II
A
Because §1 of the Sherman Act “does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy,” Copperweld Corp. v. Independence Tube Corp., 467 U. S. 752, 775 (1984), “[t]he crucial question” is whether the challenged anticompetitive conduct “stem[s] from independent decision or from an agreement, tacit or express,” Theatre Enterprises, 346 U. S., at 540. While a showing of parallel “business behavior is admissible circumstantial evidence from which the fact finder may infer agreement,” it falls short of “conclusively establishing] agreement or . . . itself constituting] a Sherman Act offense.” Id., at 540-541. Even “conscious parallelism,” a common reaction of “firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output deei *554 sions” is “not in itself unlawful.” Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U. S. 209, 227 (1993); see 6 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1433a, p. 236 (2d ed. 2003) (hereinafter Ajreeda & Hovenkamp) (“The courts are nearly unanimous in saying that mere interdependent parallelism does not establish the contract, combination, or conspiracy required by Sherman Act § 1”); Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv. L. Rev. 655, 672 (1962) (“[M]ere interdependence of basic price decisions is not conspiracy”).
The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. See, e. g., AEI-Brookings Joint Center for Regulatory Studies, Epstein, Motions to Dismiss Antitrust Cases: Separating Fact from Fantasy, Related Publication 06-08, pp. 3-4 (2006) (discussing problem of “false positives” in § 1 suits). Accordingly, we have previously hedged against false inferences from identical behavior at a number of points in the trial sequence. An antitrust conspiracy plaintiff with evidence showing nothing beyond parallel conduct is not entitled to a directed verdict, see Theatre Enterprises, supra; proof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action, see Monsanto Co. v. Spray-Rite Service Corp., 465 U. S. 752 (1984); and at the summary judgment stage a § 1 plaintiff’s offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently, see Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U. S. 574 (1986).
B
This case presents the antecedent question of what a plaintiff must plead in order to state a claim under §1 of the *555 Sherman Act. Federal Rule of Civil Procedure 8(a)(2) requires only “a short and plain statement of the claim showing that the pleader is entitled to relief,” in order to “give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,” Conley v. Gibson, 355 U. S. 41, 47 (1957). While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ibid.; Sanjuan v. American 13d. of Psychiatry and Neurology, Inc., 40 F. 3d 247, 251 (CA7 1994), a plaintiff’s obligation to provide the “grounds” of his “entitle[ment] to relief” requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see Papasan v. Allain, 478 U. S. 265, 286 (1986) (on a motion to dismiss, courts “are not bound to accept as true a legal conclusion couched as a factual allegation”). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004) (hereinafter Wright & Miller) (“[T]he pleading must contain something more . . . than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action”),[3] on the assumption that all the allegations in the complaint are true (even if doubtful in fact), see, e. g., Swierkiewicz v. *556 Sorema N. A, 534 U. S. 506, 508, n. 1 (2002); Neitzke v. Williams, 490 U. S. 319, 327 (1989) (“Rule 12(b)(6) does not countenance ... dismissals based on a judge’s disbelief of a complaint’s factual allegations”); Scheuer v. Rhodes, 416 U. S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears “that a recovery is very remote and unlikely”).
In applying these general standards to a § 1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.[4] And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and “that a recovery is very remote and unlikely.” Ibid. In identifying facts that are suggestive enough to render a § 1 conspiracy plausible, we have the benefit of the prior rulings and considered views of leading commentators, already quoted, that lawful parallel conduct fails to bespeak unlawful agreement. It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without *557 more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.
The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the “plain statement” possess enough heft to “sho[w] that the pleader is entitled to relief.” A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant’s commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the eomplaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of “entitle[ment] to relief.” Cf. DM Research, Inc. v. College of Am. Pathologists, 170 F. 3d 53, 56 (CA1 1999) (“[T]erms like ‘conspiracy,’ or even ‘agreement,’ are border-line: they might well be sufficient in conjunction with a more specific allegation — for example, identifying a written agreement or even a basis for inferring a tacit agreement,. . . but a court is not required to accept such terms as a sufficient basis for a complaint”).[5]
We alluded to the practical significance of the Rule 8 entitlement requirement in Dura Pharmaceuticals, Inc. v. Broudo, 544 U. S. 336 (2005), when we explained that something beyond the mere possibility of loss causation must be *558 alleged, lest a plaintiff with “ ‘a largely groundless claim’ ” be allowed to “ ‘take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value.’” Id., at 347 (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U. S. 723, 741 (1975)). So, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, “ ‘this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court.’” 5 Wright & Miller §1216, at 233-234 (quoting Daves v. Hawaiian Dredging Co., 114 F. Supp. 643, 645 (Haw. 1953)); see also Dura, supra, at 346; Asahi Glass Co. v. Pentech Pharmaceuticals, Inc., 289 F. Supp. 2d 986, 995 (ND Ill. 2003) (Posner, J., sitting by designation) (“[S]ome threshold of plausibility must be crossed at the outset before a patent antitrust ease should be permitted to go into its inevitably costly and protracted discovery phase”).
Thus, it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, cf. Poller v. Columbia Broadcasting System, Inc., 368 U. S. 464, 473 (1962), but quite another to forget that proceeding to antitrust discovery can be expensive. As we indicated over 20 years ago in Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U. S. 519, 528, n. 17 (1983), “a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.” See also Car Carriers, Inc. v. Ford Motor Co., 745 F. 2d 1101, 1106 (CA7 1984) (“[T]he costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint”); Note, Modeling the Effect of One-Way Fee Shifting on Discovery Abuse in Private Antitrust Litigation, 78 N. Y. U. L. Rev. 1887, 1898-1899 (2003) (discussing the unusually high cost of discovery in antitrust cases); Manual for Complex Lit *559 igation, Fourth, § 30, p. 519 (2004) (describing extensive scope of discovery in antitrust cases); Memorandum from Paul V. Niemeyer, Chair, Advisory Committee on Civil Rules, to Hon. Anthony J. Scirica, Chair, Committee on Rules of Practice and Procedure (May 11,1999), 192 F. R. D. 354,357 (2000) (reporting that discovery accounts for as much as 90 percent of litigation costs when discovery is actively employed). That potential expense is obvious enough in the present case: plaintiffs represent a putative class of at least 90 percent of all subscribers to local telephone or high-speed Internet service in the continental United States, in an action against America’s largest telecommunications firms (with many thousands of employees generating reams and gigabytes of business records) for unspecified (if any) instances of antitrust violations that allegedly occurred over a period of seven years.
It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through “careful case management,” post, at 573, given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side. See, e.g., Easterbrook, Discovery as Abuse, 69 B. U. L. Rev. 635, 638 (1989) (“Judges can do little about impositional discovery when parties control the legal claims to be presented and conduct the discovery themselves”). And it is self-evident that the problem of discovery abuse cannot be solved by “careful scrutiny of evidence at the summary judgment stage,” much less “lucid instructions to juries,” post, at 573; the threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching those proceedings. Probably, then, it is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no “ ‘reasonably founded hope that the [discovery] process will reveal relevant evidence’” to support a §1 claim. Dura, *560 544 U. S., at 347 (quoting Blue Chip Stamps, supra, at 741; alteration in Dura).[6]
Plaintiffs do not, of course, dispute the requirement of plausibility and the need for something more than merely parallel behavior explained in Theatre Enterprises, Monsanto, and Matsushita, and their main argument against the plausibility standard at the pleading stage is its ostensible *561 conflict with an early statement of ours construing Rule 8. Justice Black’s opinion for the Court in Conley v. Gibson spoke not only of the need for fair notice of the grounds for entitlement to relief but of “the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.” 355 U. S., at 45-46. This “no set of facts” language can be read in isolation as saying that any statement revealing the theory of the claim will suffice unless its factual impossibility may be shown from the face of the pleadings; and the Court of Appeals appears to have read Conley in some such way when formulating its understanding of the proper pleading standard, see 425 F. 3d, at 106, 114 (invoking Conley’s “no set of facts” language in describing the standard for dismissal).[7]
On such a focused and literal reading of Conley’s “no set of facts,” a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some “set of [undisclosed] facts” to support recovery. So here, the Court of Appeals specifically found the prospect of unearthing direct evidence of conspiracy sufficient to preclude dismissal, even though the complaint does not set forth a single *562 fact in a context that suggests an agreement. 425 F. 3d, at 106,114. It seems fair to say that this approach to pleading would dispense with any showing of a “ ‘reasonably founded hope’” that a plaintiff would be able to make a case, see Dura, 544 U. S., at 347 (quoting Blue Chip Stamps, 421 U. S., at 741); Mr. Micawber’s optimism would be enough.
Seeing this, a good many judges and commentators have balked at taking the literal terms of the Conley passage as a pleading standard. See, e. g., Car Carriers, 745 F. 2d, at 1106 (“Conley has never been interpreted literally” and, “[i]n practice, a complaint... must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory” (internal quotation marks omitted; emphasis and omission in original)); Ascon Properties, Inc. v. Mobil Oil Co., 866 F. 2d 1149, 1155 (CA9 1989) (tension between Conley’s “no set of facts” language and its acknowledgment that a plaintiff must provide the “grounds” on which his claim rests); O’Brien v. DiGrazia, 544 F. 2d 543, 546, n. 3 (CA1 1976) (“[W]hen a plaintiff . . . supplies facts to support his claim, we do not think that Conley imposes a duty on the courts to conjure up unpleaded facts that might turn a frivolous claim of unconstitutional . . . action into a substantial one”); McGregor v. Industrial Excess Landfill, Inc., 856 F. 2d 39,42-43 (CA6 1988) (quoting O’Brien’s analysis); Hazard, From Whom No Secrets Are Hid, 76 Texas L. Rev. 1665, 1685 (1998) (describing Conley as having “turned Rule 8 on its head”); Marcus, The Revival of Fact Pleading Under the Federal Rules of Civil Procedure, 86 Colum. L. Rev. 433, 463-465 (1986) (noting tension between Conley and subsequent understandings of Rule 8).
We could go on, but there is no need to pile up further citations to show that Conley’s “no set of facts” language has been questioned, criticized, and explained away long enough. To be fair to the Conley Court, the passage should be understood in light of the opinion’s preceding summary of the com *563 plaint’s concrete allegations, which the Court quite reasonably understood as amply stating a claim for relief. But the passage so often quoted fails to mention this understanding on the part of the Court, and after puzzling the profession for 50 years, this famous observation has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. See Sanjuan, 40 F. 3d, at 251 (once a claim for relief has been stated, a plaintiff “receives the benefit of imagination, so long as the hypotheses are consistent with the complaint”); accord, Swierkiewicz, 534 U. S., at 514; National Organization for Women, Inc. v. Scheidler, 510 U. S. 249, 256 (1994); H. J. Inc. v. Northwestern Bell Telephone Co., 492 U. S. 229, 249-250 (1989); Hishon v. King & Spalding, 467 U. S. 69, 73 (1984). Conley, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint’s survival.[8]
*564 III
When we look for plausibility in this complaint, we agree with the District Court that plaintiffs’ claim of conspiracy in restraint of trade comes up short. To begin with, the complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs. Supra, at 550-551. Although in form a few stray statements speak directly of agreement,[9] on fair reading these are merely legal conclusions resting on the prior allegations. Thus, the com *565 plaint first takes account of the alleged “absence of any meaningful competition between [the ILECs] in one another’s markets,” “the parallel course of conduct that each [ILEC] engaged in to prevent competition from CLECs,” “and the other facts and market circumstances alleged [earlier]”; “in light of” these, the complaint concludes “that [the ILECs] have entered into a contract, combination or conspiracy to prevent competitive entry into their . . . markets and have agreed not to compete with one another.” Complaint ¶51, App. 27.[10] The nub of the complaint, then, is the ILECs’ parallel behavior, consisting of steps to keep the CLECs out and manifest disinterest in becoming CLECs themselves, and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience.[11]
*566 We think that nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy. As to the ILECs’ supposed agreement to disobey the 1996 Act and thwart the CLECs’ attempts to compete, we agree with the District Court that nothing in the complaint intimates that the resistance to the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on keeping its regional dominance. The 1996 Act did more than just subject the ILECs to competition; it obliged them to subsidize their competitors with their own equipment at wholesale rates. The economic incentive to resist was powerful, but resisting competition is routine market conduct, and even if the ILECs flouted the 1996 Act in all the ways the plaintiffs allege, see id., ¶ 47, App. 23-24, there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway; so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing.
The complaint makes its closest pass at a predicate for conspiracy with the claim that collusion was necessary because success by even one CLEG in an ILEC’s territory “would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories.” Id., ¶ 50, App. 26-27. But, its logic aside, this general premise still fails to answer the point that there was just no need for joint encouragement to resist the 1996 Act; as the District Court said, “each ILEC has reason to want to avoid dealing with CLECs” and “each ILEC would attempt to keep CLECs out, regardless of the actions of the other ILECs.” 313 F. Supp. 2d, at 184; cf. Kramer v. Pollock-Krasner Foundation, 890 F. Supp. 250, 256 (SONY 1995) (while the plaintiff “may believe the defendants conspired ... , the defendants’ allegedly conspiratorial ac *567 tions could equally have been prompted by lawful, independent goals which do not constitute a conspiracy”).[12]
Plaintiffs’ second conspiracy theory rests on the competitive reticence among the ILECs themselves in the wake of the 1996 Act, which was supposedly passed in the “‘hop[e] that the large incumbent local monopoly companies ... might attack their neighbors’ service areas, as they are the best situated to do so.’” Complaint ¶38, App. 20 (quoting Consumer Federation of America, Lessons from 1996 Telecommunications Act: Deregulation Before Meaningful Competition Spells Consumer Disaster, p. 12 (Feb. 2000)). Contrary to hope, the ILECs declined “ ‘to enter each other’s service territories in any significant way,’ ” Complaint ¶ 38, App. 20, and the local telephone and high-speed Internet market remains highly compartmentalized geographically, with minimal competition. Based on this state of affairs, and perceiving the ILECs to be blessed with “especially attractive business opportunities” in surrounding markets dominated by other ILECs, the plaintiffs assert that the ILECs’ parallel conduct was “strongly suggestive of conspiracy.” Id., ¶ 40, App. 21.
But it was not suggestive of conspiracy, not if history teaches anything. In a traditionally unregulated industry with low barriers to entry, sparse competition among large firms dominating separate geographical segments of the market could very well signify illegal agreement, but here we have an obvious alternative explanation. In the decade *568 preceding the 1996 Act and well before that, monopoly was the norm in telecommunications, not the exception. See Verizon Communications Inc. v. FCC, 535 U. S. 467, 477-478 (2002) (describing telephone service providers as traditional public monopolies). The ILECs were born in that world, doubtless liked the world the way it was, and surely knew the adage about him who lives by the sword. Hence, a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors tp do the same thing.
In fact, the complaint itself gives reasons to believe that the ILECs would see their best interests in keeping to their old turf. Although the complaint says generally that the ILECs passed up “especially attractive business opportunities]” by declining to compete as CLECs against other ILECs, Complaint ¶ 40, App. 21, it does not allege that competition as CLECs was potentially any more lucrative than other opportunities being pursued by the ILECs during the same period,[13] and the complaint is replete with indications that any CLEC faced nearly insurmountable barriers to profitability owing to the ILECs’ flagrant resistance to the network sharing requirements of the 1996 Act, id., ¶ 47, App. *569 23-26. Not only that, but even without a monopolistic tradition and the peculiar difficulty of mandating shared networks, “[f]irms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets.” Areeda & Hovenkamp ¶ 307d, at 155 (Supp. 2006) (commenting on the case at bar). The upshot is that Congress may have expected some ILECs to become CLECs in the legacy territories of other ILECs, but the disappointment does not make conspiracy plausible. We agree with the District Court’s assessment that antitrust conspiracy was not suggested by the facts adduced under either theory of the complaint, which thus fails to state a valid § 1 claim.[14]
Plaintiffs say that our analysis runs counter to Swierkiewicz, 534 U. S., at 508, which held that “a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U. S. 792 (1973).” They argue that just as the prima facie case is a “flexible evidentiary standard” that “should not be transposed into a rigid pleading standard for discrimination cases,” Swierkiewicz, supra, at 512, “trans-posting] 'plus factor’ summary judgment analysis woodenly into a rigid Rule 12(b)(6) pleading standard . . . would be unwise,” Brief for Respondents 39. As the District Court *570 correctly understood, however, “Swierkiewicz did not change the law of pleading, but simply re-emphasized . . . that the Second Circuit’s use of a heightened pleading standard for Title VII cases was contrary to the Federal Rules’ structure of liberal pleading requirements.” 313 F. Supp. 2d, at 181 (citation and footnote omitted). Even though Swierkiewicz’s pleadings “detailed the events leading to his termination, provided relevant dates, and included the ages and nationalities of at least some of the relevant persons involved with his termination,” the Court of Appeals dismissed his complaint for failing to allege certain additional facts that Swierkiewicz would need at the trial stage to support his claim in the absence of direct evidence of discrimination. Swierkiewicz, 534 U. S., at 514. We reversed on the ground that the Court of Appeals had impermissibly applied what amounted to a heightened pleading requirement by insisting that Swierkiewicz allege “specific facts” beyond those necessary to state his claim and the grounds showing entitlement to relief. Id., at 508.
Here, in contrast, we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.
* * *
The judgment of the Court of Appeals for the Second Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

 The 1984 divestiture of AT&T’s local telephone service created seven Regional Bell Operating Companies. Through a series of mergers and acquisitions, those seven companies were consolidated into the four ILECs named in this suit: BellSouth Corporation, Qwest Communications International, Inc., SBC Communications, Inc., and Verizon Communications, Inc. (successor-in-interest to Bell Atlantic Corporation). Complaint ¶ 21, App. 16. Together, these ILECs allegedly control 90 percent or more of the market for local telephone service in the 48 contiguous States. Id., ¶ 48, App. 26.

 In setting forth the grounds for § 1 relief, the complaint repeats these allegations in substantially similar language:
“Beginning at least as early as February 6,1996, and continuing to the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a contract, combination or conspiracy to pre *552 vent competitive entry in their respective local telephone and/or high speed internet services markets by, among other things, agreeing not to compete with one another and to stifle attempts by others to compete with them and otherwise allocating customers and markets to one another in violation of Section 1 of the Sherman Act.” Id., ¶ 64, App. 30-31.

 The dissent greatly oversimplifies matters by suggesting that the Federal Rules somehow dispensed with the pleading of facts altogether. See post, at 580 (opinion of Stevens, J.) (pleading standard of Federal Rules “does not require, or even invite, the pleading of facts”). While, for most types of cases, the Federal Rules eliminated the cumbersome requirement that a claimant “set out in detail the facts upon which he bases his claim,” Conley v. Gibson, 355 U. S. 41, 47 (1957) (emphasis added), Rule 8(a)(2) still requires a “showing,” rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only ‘Tair notice” of the nature of the claim, but also “grounds” on which the claim rests. See 5 Wright & Miller § 1202, at 94, 95 (Rule 8(a) “contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented” and does not authorize a pleader’s “bare averment that he wants relief and is entitled to it”).

 Commentators have offered several examples of parallel conduct allegations that would state a § 1 claim under this standard. See, e. g., 6 Areeda & Hovenkamp ¶ 1425, at 167-185 (discussing “parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties”); Blechman, Conscious Parallelism, Signalling and Facilitating Devices: The Problem of Tacit Collusion Under the Antitrust Laws, 24 N. Y. L. S. L. Rev. 881,899 (1979) (describing “conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement”). The parties in this case agree that “complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason,” would support a plausible inference of conspiracy. Brief for Respondents 37; see also Reply Brief for Petitioners 12.

 The border in DM Research was the line between the conclusory and the factual. Here it lies between the factually neutral and the factually suggestive. Each must be crossed to enter the realm of plausible liability.

 The dissent takes heart in the reassurances of plaintiffs’ counsel that discovery would be ‘““phased””’ and “limited to the existence of the alleged conspiracy and class certification.” Post, at 593. But determining whether some illegal agreement may have taken place between unspecified persons at different ILECs (each a multibillion dollar corporation with legions of management level employees) at some point over seven years is a sprawling, costly, and. hugely time-consuming undertaking not easily susceptible to the kind of line drawing and case management that the dissent envisions. Perhaps the best answer to the dissent’s optimism that antitrust discovery is open to effective judicial control is a more extensive quotation of the authority just cited, a judge with a background in antitrust law. Given the system that we have, the hope of effective judicial supervision is slim:
“The timing is all wrong. The plaintiff files a sketchy complaint (the Rules of Civil Procedure discourage fulsome documents), and discovery is launched. A judicial officer does not know the details of the case the parties will present and in theory cannot know the details. Discovery is used to find the details. The judicial officer always knows less than the parties, and the parties themselves may not know very well where they are going or what they expect to find. A magistrate supervising discovery does not — cannot—know the expected productivity of a given request, because the nature of the requester’s claim and the contents of the files (or head) of the adverse party are unknown. Judicial officers cannot measure the costs and benefits to the requester and so cannot isolate impositional requests. Requesters have no reason to disclose their own estimates because they gain from imposing costs on rivals (and may lose from an improvement in accuracy). The portions of the Rules of Civil Procedure calling on judges to trim back excessive demands, therefore, have been, and are doomed to be, hollow. We cannot prevent what we cannot detect; we cannot detect what we cannot define; we cannot define ‘abusive’ discovery except in theory, because in practice we lack essential information.” Easterbrook, Discovery as Abuse, 69 B. U. L. Rev. 635, 638-639 (1989) (footnote omitted).

 The Court of Appeals also relied on Chief Judge Clark’s suggestion in Nagler v. Admiral Corp., 248 F. 2d 319 (CA2 1957), that facts indicating parallel conduct alone suffice to state a claim under § 1. 425 F. 3d, at 114 (citing Nagler, supra, at 325). But Nagler gave no explanation for citing Theatre Enterprises (which upheld a denial of a directed verdict for plaintiff on the ground that proof of parallelism was not proof of conspiracy) as authority that pleading parallel conduct sufficed to plead a Sherman Act conspiracy. Now that Monsanto Co. v. Spray-Rite Service Corp., 465 U. S. 752 (1984), and Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U. S. 574 (1986), have made it clear that neither parallel conduct nor conscious parallelism, taken alone, raise the necessary implication of conspiracy, it is time for a fresh look at adequacy of pleading when a claim rests on parallel action.

 Because Conleyfe ‘“no set of facts’” language was one of our earliest statements about pleading under the Federal Rules, it is no surprise that it has since been “cited as authority” by this Court and others. Post, at 577. Although we have not previously explained the circumstances and rejected the literal reading of the passage embraced by the Court of Appeals, our analysis comports with this Court’s statements in the years since Conley. See Dura Pharmaceuticals, Inc. v. Broudo, 544 U. S. 336, 347 (2005) (requiring “ ‘reasonably founded hope that the [discovery] process will reveal relevant evidence’ ” to support the claim (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U. S. 723, 741 (1975); alteration in Dura)); Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U. S. 519, 526 (1983) (“It is not . . . proper to assume that [the plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged”); Wilson v. Schnettler, 365 U. S. 381, 383 (1961) (“In the absence of... an allegation [that the arrest was made without probable cause] the courts below could not, nor can we, assume that respondents arrested petitioner without probable cause to believe that he had committed ... a narcotics offense”). Nor are *564 we reaching out to decide this issue in a case where the matter was not raised by the parties, see post, at 579, since both the ILECs and the Government highlight the problems stemming from a literal interpretation of Conley’s “no set of facts” language and seek clarification of the standard. Brief for Petitioners 27-28; Brief for United States as Amicus Curiae 22-25; see also Brief for Respondents 17 (describing “[p]etitioners and their amici” as mounting an “attack on Conley’s ‘no set of facts’ standard”).
The dissent finds relevance in Court of Appeals precedents from the 1940s, which allegedly gave rise to Conley's “no set of facts” language. See post, at 580-583. Even indulging this line of analysis, these cases do not challenge the understanding that, before proceeding to discovery, a complaint must allege facts suggestive of illegal conduct. See, e.g., Leimer v. State Mut. Life Assurance Co. of Worcester, Mass., 108 F. 2d 302, 305 (CA8 1940) (“ ‘[I]f, in view of what is alleged, it can reasonably be conceived that the plaintiffs ... could, upon a trial, establish a case which would entitle them to . . . relief, the motion to dismiss should not have been granted’ ”); Continental Collieries, Inc. v. Shober, 130 F. 2d 631, 635 (CA3 1942) (“No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it”). Rather, these cases stand for the unobjectionable proposition that, when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder. Cf. Scheuer v. Rhodes, 416 U. S. 232, 236 (1974) (a district court weighing a motion to dismiss asks “not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims”).

 See Complaint ¶¶ 51, 64, App. 27,30-31 (alleging that ILECs engaged in a “contract, combination or conspiracy” and agreed not to compete with one another).

 If the complaint had not explained that the claim of agreement rested on the parallel conduct described, we doubt that the complaint’s references to an agreement among the ILECs would have given the notice required by Rule 8. Apart from identifying a 7-year span in which the § 1 violations were supposed to have occurred (1 e., “[beginning at least as early as February 6, 1996, and continuing to the present,” id., ¶ 64, App. 30), the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies. This lack of notice contrasts sharply with the model form for pleading negligence, Form 9, which the dissent says exemplifies the kind of “bare allegation” that survives a motion to dismiss. Post, at 576. Whereas the model form alleges that the defendant struck the plaintiff with his car while plaintiff was crossing a particular highway at a specified date and time, the complaint here furnishes no clue as to which of the four ILECs (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place. A defendant wishing to prepare an answer in the simple fact pattern laid out in Form 9 would know what to answer; a defendant seeking to respond to plaintiffs’ conelusory allegations in the § 1 context would have little idea where to begin.

 The dissent’s quotations from the complaint leave the impression that plaintiffs directly allege illegal agreement; in fact, they proceed exclusively via allegations of parallel conduct, as both the District Court and Court of Appeals recognized. See 313 F. Supp. 2d 174, 182 (SDNY 2003); 425 F. 3d 99, 102-104 (CA2 2005).

 From the allegation that the ILECs belong to various trade associations, see Complaint ¶ 46, App. 23, the dissent playfully suggests that they conspired to restrain trade, an inference said to be “buttressed by the common sense of Adam Smith.” Post, at 591, 594. If Adam Smith is peering down today, he may be surprised to learn that his tongue-in-cheek remark would be authority to force his famous pinmaker to devote financial and human capital to hire lawyers, prepare for depositions, and otherwise fend off allegations of conspiracy; all this just because he belonged to the same trade guild as one of his competitors when their pins carried the same price tag.

 The complaint quoted a reported statement of Qwest’s CEO, Richard Notebaert, to suggest that the ILECs declined to compete against each other despite recognizing that it “ ‘might be a good way to turn a quick dollar.’” ¶42, App. 22 (quoting Chicago Tribune, Oct. 31, 2002, Business Section, p. 1). This was only part of what he reportedly said, however, and the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn. See Fed. Rule Evid. 201.
Notebaert was also quoted as saying that entering new markets as a CLEC would not be “a sustainable economic model” because the CLEC pricing model is “just... nuts.” Chicago Tribune, Oct. 31,2002, Business Section, p. 1 (cited at Complaint ¶ 42, App. 22). Another source cited in the complaint quotes Notebaert as saying he thought it “unwise” to “base a business plan” on the privileges accorded to CLECs under the 1996 Act because the regulatory environment was too unstable. Chicago Tribune, Dec. 19, 2002, Business Section, p. 2 (cited at Complaint ¶ 45, App. 23).

 In reaching this conclusion, we do not apply any “heightened” pleading standard, nor do we seek to broaden the scope of Federal Rule of Civil Procedure 9, which can only be accomplished “ ‘by the process of amending the Federal Rules, and not by judicial interpretation.’” Swierkiewicz v. Sorema N. A, 534 U. S. 506, 515 (2002) (quoting Leathermcm v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U. S. 163, 168 (1993)). On certain subjects understood to raise a high risk of abusive litigation, a plaintiff must state factual allegations with greater particularity than Rule 8 requires. Fed. Rules Civ. Proc. 9(b)-(c). Here, our concern is not that the allegations in the complaint were insufficiently “particularized],” ibid.; rather, the complaint warranted dismissal because it failed in toto to render plaintiffs’ entitlement to relief plausible.