[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-12214
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 24, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-00753-CV-RWS-1

COCA-COLA ENTERPRISES INC.,
ENTERPRISES ACQUISITION COMPANY, INC.,
THE COCA-COLA COMPANY,
THE COCA-COLA TRADING COMPANY, INC.

Plaintiffs-Appellants,

versus

NOVELIS CORPORATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(October 24, 2008)**

Before TJOFLAT, BLACK and CARNES, Circuit Judges.

PER CURIAM:

Coca-Cola Enterprises appeals the district court's judgment granting dismissal under Rule 12(b)(6) to the defendants Novelis Corporation and Alcan Corporation.[1] Coca-Cola alleges that Novelis breached the most-favored nation (MFN) provision of its aluminum supply contract by offering Anheuser-Busch the same ceiling metal price as Coca-Cola received, but for a period of time that extended beyond the end of the Coca-Cola contract. The district court dismissed Coca-Cola's complaint after finding that Novelis' deal with Anheuser-Busch did not trigger the MFN clause. We affirm.

**I.**

In January 2002 the parties entered into a Long Term Marketing Agreement under which Alcan—and later, Novelis—would provide aluminum can sheet to Coca-Cola bottling companies. The Long Term Marketing Agreement was to terminate on December 31, 2006. Under the contract, the parties established that the can sheet's price, designated "P1 of the Pricing Schedule" would be a floating amount computed by combining the market price of aluminum with Novelis' charge to convert that aluminum into can sheet. The parties also agreed that,

---

[1] Novelis Corporation is, by merger and name change, the successor to Alcan Corporation's rights and obligations under this contract.

regardless of the market price for aluminum, that component of Coca-Cola's price would be capped at 85 cents per pound.

The parties also settled on a most-favored nation provision, designed to prevent Novelis from underselling its Coca-Cola deal by offering better terms to another aluminum buyer. Under the MFN, if Novelis offered any other customer either "(A) a lower conversion cost/lb for at least three months . . . (B) a lower ceiling or floor, for at least six months . . . [or] (C) any other element, except Investment Related Discounts, that [made] the offer more advantageous as a whole to the customer than P1 of the Pricing Schedule," then Novelis would have to offer the same element to the Coca-Cola bottlers "for the same duration covered by the offer to the other customer."

In June 2004 Novelis entered into a similar five-year aluminum supply contract with Anheuser-Busch. Anheuser-Busch received the same 85-cent cap on its metal price component, but because that contract began in 2004, its price ceiling was effective through 2009.

In late 2005 the price of aluminum rose above 85 cents per pound. Novelis honored its contractual ceiling for that component in Coca-Cola's contract until it expired in December 2006. However, in negotiating a new contract with Coca-Cola, Novelis refused to include a price ceiling for the period from 2007 through

3

2011. Instead, the parties entered into a new contract, the Soft-Toll Agreement, which contained no ceiling on the price of aluminum but did contain an MFN provision. Coca-Cola then sued Novelis in Georgia state court, alleging that its aluminum sales to Anheuser-Busch at 85 cents per pound violate the Soft-Toll Agreement. That case is pending.[2]

In April 2007 Coca-Cola filed a separate complaint against Novelis and its predecessor Alcan in the United States District Court for the Northern District of Georgia. Coca-Cola alleged that Novelis' refusal to extend its 85-cent price ceiling through 2009 was a breach of the Long Term Marketing Agreement's MFN provision. Novelis filed a Rule 12(b)(6) motion to dismiss, which the district court granted. Coca-Cola timely appeals.

## II.

We review de novo the dismissal of a complaint under Fed. R. Civ. P. 12(b)(6), "applying the same standard as did the district court." Rivell v. Private Health Care Sys. Inc., 520 F.3d 1308, 1309 (11th Cir. 2008).

The Long Term Marketing Agreement dictates, and the parties agree, that New York law applies. Under New York law, ambiguity in a contractual provision creates a question of fact, and all ambiguities must be resolved in the

---

[2] Attempts to remove that case to federal court failed for lack of complete diversity.

plaintiff's favor at this stage. Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 178 (2d Cir. 2004) (applying New York law) ("[A] claim predicated on a materially ambiguous contract term is not dismissible on the pleadings."). However, a plaintiff cannot create ambiguity in a contract simply by alleging a different interpretation of a contractual provision. Elletson v. Bonded Insulation Co., 272 A.D.2d 825, 827, 708 N.Y.S.2d 511, 513 (N.Y. App. Div. 2000) ("[A]n ambiguity does not exist simply because the parties urge different interpretations.") (quotation marks omitted). An unambiguous contractual provision has a "definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable basis for a difference of opinion." Krystal Investigations & Sec. Bureau, Inc. v. United Parcel Serv. Inc., 35 A.D.3d 817, 818, 826 N.Y.S.2d 727, 728 (N.Y. App. Div. 2006).

If the agreement unambiguously supports the defendant's interpretation, the plaintiff's complaint may be dismissed on the pleadings. Id., 826 N.Y.S.2d at 729 ("Contrary to the plaintiff's contention, the agreement between the parties was clear and unambiguous . . . . Accordingly, the court correctly granted the defendant's motion to dismiss the complaint."); see also Bell Atl. Corp. v. Twombly, 550 U.S. ___, 127 S. Ct. 1955, 1968 (2007) (holding that dismissal

5

under Rule 12(b)(6) is appropriate for complaints that fail to state "plausible"

claims for relief).

## III.

The relevant provision of the Long Term Marketing Agreement, Section

10.1, states:

> If, taking into account all incentives, discounts, rebates, credits, Scrap Spreads and the like, but not "Investment Related Discounts". . . ALCAN, or any ALCAN Affiliate, offers (offer includes any offer or proposal, including, but not limited to, those initiated by ALCAN or those made in response to a request, initiative, or counter of another purchaser, except as otherwise provided in Section 9.2) to any customer, or other user of Aluminum Can Stock, for delivery in North America,
>
> > (A) a lower conversion cost/lb for at least three months or consecutive periods totaling at least three months, not to exceed three months in a year, then X1 in the Pricing Schedule (Exhibit 2), or
> >
> > (B) a lower ceiling or floor, for at least six months or consecutive periods totaling at least six months, not to exceed six months in a year, than that provided in Section 4 of the Pricing Schedule (Exhibit 2) or
> >
> > (C) any other element, except Investment Related Discounts, that makes the offer more advantageous as a whole to the customer than P1 of the Pricing Schedule (Exhibit 2),
>
> then the elements included in such offer shall be offered to PARTICIPANTS [Coca-Cola bottlers] for the same duration covered by the offer to the other customer.  Each PARTICIPANT may accept or decline the offer for its volume.  If accepted, the price for the

accepted volume is provided in Section 2.5 of the Pricing Schedule (Exhibit 2).

The parties agree that Sections 10.1(A) and 10.1(B) were not violated, because Anheuser-Busch did not receive a lower conversion cost or a lower ceiling than Coca-Cola's 85 cents per pound. Instead, Coca-Cola alleges that Novelis violated Section 10.1(C) when it gave Anheuser-Busch an 85-cent ceiling price valid until 2009, while Coca-Cola's ended in 2006.

The issue before this Court is whether Section 10.1(C) is ambiguous—that is, whether it is reasonable to read it as triggered by Novelis offering a competitor the same price terms for the same period of time, but starting later and thus ending later than Coca-Cola's Long Term Marketing Agreement. If the contractual language cannot reasonably bear the interpretation that Coca-Cola requires in order to state a claim for its breach, the district court did not err in granting Rule 12(b)(6) dismissal. See, e.g., Krystal Investigations, 35 A.D.3d at 818, 826 N.Y.S.2d at 729.

Most importantly, Section 10.1 is about price, not time. The section begins by "taking into account all incentives, discounts, rebates, credits, Scrap Spreads and the like." All of these are price terms, and the principle of ejusdem generis prevents an unrelated term like "duration of contract" from slipping in through

7

"and the like." See 242–44 East 77th St., LLC v. Greater New York Mut. Ins. Co., 31 A.D.3d 100, 103–04, 815 N.Y.S.2d 507, 510 (N.Y. App. Div. 2006) ("[T]he meaning of a word in a series of words is determined by the company it keeps.") (citation and quotation marks omitted).

Section 10.1(A) addresses conversion costs and prevents a competitor from receiving a lower conversion price than X1, the equivalent term in Coca-Cola's contract. Section 10.1(B) addresses price ceilings and floors, and prevents a competitor from receiving a lower floor or ceiling than those agreed to in Coca-Cola's contract. As Coca-Cola points out, both of these sections do include periods of time. A lower conversion cost would not trigger the MFN under Section 10.1(A) unless it lasted at least three months; similarly, a lower floor or ceiling must last at least six months under Section 10.1(B) in order to trigger the MFN. But these timing phrases exist only to constrain the lower conversion costs and lower floors or ceilings that the MFN focuses on. Every time period in Section 10.1 is expressly tied to a monetary form involving a lower price. Nowhere does "time"—much less a date of contract termination—stand alone as an element of price that could trigger Sections 10.1(A) or (B).

Finally, following the "lower conversion cost" in Section 10.1(A) and the "lower ceiling or floor" in Section 10.1(B), Section 10.1(C) covers "any other

element"—except one specific kind of discount—that "makes the offer more advantageous as a whole to the customer than P1 of the Pricing Schedule (Exhibit 2)."  P1 of the Pricing Schedule is the sum of elements X1, Y1, and Z1, and represents the total price of the can sheet to Coca-Cola.  Thus, the phrase "any other element" unambiguously means any other element that factors into that price.  The obvious comparison is between any element of a competitor's deal that factors into its price and the corresponding element that factors into P1, Coca-Cola's price.

No allegation has been made that Novelis offered Anheuser-Busch any element that made its pricing more advantageous than P1 of Coca-Cola's Pricing Schedule during the term of the Long Term Marketing Agreement.  Instead, the two competitors received the same 85-cent ceiling on the price of metal, meaning that through December 31, 2006, when the Long Term Marketing Agreement terminated, no competitor had received a better price than Coca-Cola.  In fact, even after the Long Term Marketing Agreement terminated, Anheuser-Busch apparently did not receive a better price than Coca-Cola had received, but only a better price than Coca-Cola was able to prospectively negotiate after its MFN provision expired.

Reading Section 10.1 as Coca-Cola does would allow any other offer made by Novelis between 2002 and 2006, regardless of its termination date and regardless of its price (so long as it offered a price better than the 2007 open-market price) to fall within the MFN for the _other_ contract's entire period. Under Coca-Cola's reasoning, unless Novelis terminated all other recent contracts on December 31, 2006, Coca-Cola would always be able to glom onto a competitor's ongoing contract price to keep its own metal price down. All of this, according to Coca-Cola, occurs at and after the expiration of Coca-Cola's own deal on which its contractual rights are allegedly based. It is difficult to imagine an MFN provision that implicitly grants a party the right to the best price even after the MFN itself, as part of a dated contract, explicitly expires. When an MFN provision expires, it ends. Here, that provision ended on December 31, 2006.

Coca-Cola has not alleged that before December 31, 2006, any other party received a better price element than any of those in its own P1—and that is all that Section 10.1(C) prohibits.

**AFFIRMED.**