MAYER, Circuit Judge,
dissenting.
The court improperly tests the complaint filed by Bell/Heery, a Joint Venture (“Bell/Heery”), “in a crucible hotter than the plausibility standard demands.” Rodriguez-Reyes v. Molino-Rodriguez, 711 F.3d 49, 53 (1st Cir.2013). Bell/Heery’s complaint contained well-pled allegations that the Federal Bureau of Prisons (the “Bureau”) breached two express contractual provisions when it refused to meet or consult with local officials who had imposed permitting restrictions that were contrary to accepted industry standards and sound engineering practices. Because these allegations were more than sufficient to stake out “a plausible claim for relief,” Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the court errs in affirming the dismissal of Bell/Heery’s complaint. I therefore respectfully dissent.
I.
In its complaint, Bell/Heery alleged that New Hampshire officials imposed permitting restrictions that were so arbitrary and unreasonable that they “devastated” its ability to perform under its contract with the Bureau. J.A. 26. Bell/Heery claimed that it could not reasonably have anticipated, at the time of bid, the capricious demands made by local permitting agents given that their restrictions were contrary to “prudent earthwork engineering practice[s]” and long-established industry standards. Id. at 26. It asserted, moreover, that the Bureau breached two express contractual provisions—Technical Design Guideline 01415(D) (“TDG 01415(D)”) and Section C.4 of the Request for Proposals (“Section C.4”)—when it refused to meet or consult with officials from the New Hampshire Department of Environmental Services (“NHDES”) regarding their exceedingly onerous permitting demands.* J.A. 21-32. The detailed allegations contained in Bell/Heery’s twenty-four page complaint were more than adequate to withstand the government’s motion to dismiss. See San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed.Cir.1989) (explaining that a plaintiff states a claim for breach of contract by identifying a duty arising out of that contract and alleging facts sufficient to show a breach of that duty).
Without question, neither TDG 01415(D) nor Section C.4 is a model of clarity regarding the scope of the government’s obligations with respect to local permitting requirements. At the pleading stage, however, we are constrained to accept as true all well-pled factual allegations and “indulge all reasonable inferences” in a plaintiffs favor, Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed.Cir.2001), especially when the government drafted *1337 the contract. Applying that standard, TDG 01415(D) and Section C.4 can plausibly be read to require the Bureau to confer with local permitting authorities and to approve or not any recommendations made by them.
TDG 01415(D)(1)(a) requires the Bureau, together with Bell/Heery, to “consult” with state officials when “preparing the design for the project.” Section C.4 mandates that “[i]n no case are the comments or recommendations of [state and local] officials to be implemented into the developmental documents without the approval of the [Bureau].” Section C.4(e)(3). Read together, these provisions can reasonably be interpreted, at least for purposes of assessing the viability of Bell/ Heery’s complaint, to require the Bureau to take an active role in consulting with state permitting officials and approving their recommendations.
There is no merit to the court’s assertion that TDG 01415(D) cannot support a breach of contract claim because it only applies during the “design” phase, and not during the “construction” phase, of a project. See ante at 13-14. The Bureau’s alleged breach occurred when Bell/Heery was still clearing and excavating the site for the project, well before any actual construction had begun. It was when Bell/ Heery was revising its “Phasing Plan”— which contained detailed drawings showing its proposed plan for excavation and clearing on the project—that the Bureau allegedly failed to fulfill its duty to consult with New Hampshire officials. The Phasing Plan, as the Court of Federal Claims correctly noted, consisted of “a series of documents and drawings setting forth the design of [the Berlin Correctional Institution] and contemplating construction in ‘phases.’ ” See Bell/Heery v. United States, 106 Fed.Cl. 300, 306 n. 2 (2012) (emphasis added). Because the Bureau’s failure to consult with state officials occurred during the period when Bell/Heery was revising its site-work “design,” it can reasonably be inferred that the alleged breach occurred during the design, rather than the construction, phase of the project. At the very least, the question of whether the alleged breach occurred during the design phase is a disputed issue of material fact, one that must be resolved in Bell/Heery’s favor when assessing the adequacy of its complaint. See Sommers, 241 F.3d at 1378.
In any event, Section C.4, unlike TDG 01415(D), is not limited to the design phase of the project, but instead applies when “preparing construction documents.” Section C.4(e). Section C.4 specifically requires the Bureau to approve recommendations from New Hampshire officials before going forward. See id. (“In no case are the comments or recommendations of [state and local] officials to be implemented into the developmental documents without the approval of the [Bureau].”). Bell/ Heery’s allegation that the Bureau repeatedly refused to “meet or consult” with “NHDES representatives regarding NHDES comments, recommendations and requirements for the Project,” J.A. 27, therefore provides an ample predicate for a breach of contract claim. The Bureau, allegedly, failed to fulfill its duty to approve or disapprove recommendations from local officials because it simply “ignored” those recommendations, leaving Bell/Heery with “no choice but to concede to the NHDES’ arbitrary and unreasonable determinations.” Id. at 32.
II.
In affirming the dismissal of Bell/ Heery’s complaint, the court places undue weight on the Permits & Responsibilities clause (“P & R clause”). That clause provides: “The Contractor shall, without additional expense to the Government, be *1338 responsible for obtaining any necessary licenses and permits, and for complying with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work.” 48 C.F.R. § 52.286-7. While the P & R clause broadly assigns responsibility for obtaining required permits to Bell/Heery, it says nothing about whether the Bureau had an independent obligation, under TDG 01415(D) and Section C.4, to meet with state permitting authorities and approve or disapprove their recommendations.
As we have previously recognized, the scope of a contractor’s liability under the P & R clause is not unbounded, but can instead be constrained by other contractual provisions that specifically limit obligations related to compliance with regulatory and permitting requirements. Hills Materials Co. v. Rice, 982 F.2d 514, 517 (Fed.Cir.1992); see also J.E. McAmis, Inc., 2010-2 B.C.A. ¶ 34607, 2010 WL 4822734 (A.S.B.C.A.2010) (concluding that the P & R clause did not bar recovery where a contract identified certain “haul routes” for transporting materials and county officials later passed an ordinance restricting use of such routes); Odebrecht Contractors, Inc., No. 6372, 2000 WL 975128, at *33 (Eng. B.C.A. July 6, 2000) (concluding that “the boiler plate ‘Permits and Responsibilities clause’ ” did not preclude an equitable adjustment where a contract provided for unrestricted access to certain wells and the local regulatory authority later denied the contractor access to those wells); Dravo Corp., 79-1 B.C.A ¶ 13575,1978 WL 2244 (Eng. B.C.A. 1978) (concluding that the P & R clause did not preclude recovery where a contract specifically designated certain areas as “work/storage areas” and local officials subsequently denied a contractor access to those areas). Here, TDG 01415(D) and Section C.4 can be interpreted, at least for purposes of assessing the viability of Bell/ Heery’s breach of contract claim, as limiting the reach of the P & R clause and imposing a duty on the government to consult with local permitting officials and evaluate their recommendations. In affirming the dismissal of Bell/Heery’s complaint, the court turns a blind eye to these provisions, effectively reading them out of the contract. See Hills, 982 F.2d at 516-17 (emphasizing that every government contract must be read as a whole and that the P & R clause must be applied in a manner that accounts for all provisions of the agreement between the parties); see also Medlin Constr. Group, Ltd. v. Harvey, 449 F.3d 1195, 1200 (Fed.Cir.2006) (emphasizing that a government contract must be interpreted in a manner that “assure[s] that no contract provision is made inconsistent, superfluous, or redundant” (citations and internal quotation marks omitted)).
At the pleading stage, the salient inquiry is not whether Bell/Heery is likely to prevail on the merits, but instead whether it is entitled to offer evidence in support of its claims. Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 938 (Fed.Cir.2007); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (“[0]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the facts alleged] is improbable, and that a recovery is very remote and unlikely.” (citations and internal quotation marks omitted)). The court’s decision to affirm the dismissal of Bell/Heery’s complaint is an unjustified effort to “collapse discovery, summary judgment and trial into the pleading stages of [the] case.” Petro-Hunt, L.L.C. v. United States, 90 Fed.Cl. 51, 71 (2009).

 For example, NHDES officials required Bell/ Heery to revise its design for performing site work on the project eleven different times, notwithstanding the fact that its original site-work plan was purportedly fully compliant with state regulations. J.A. 23-29. According to Bell/Heery, when excavating a site, a contractor normally is allowed to cut and clear materials from one area and then use those same materials as "fill” at another area of the project. Id. at 26-29. Without any apparent justification, however, NHDES officials precluded Bell/Heery from using the standard "cut-to-fill” method, instead requiring materials that had been cut from one area to be stockpiled for extended periods, thereby "causfing] excessive rehandling and handling of materials” and dramatically increasing costs under the contract. Id. at 29-30.