**CO2 TECHNOLOGIES, INC., Plaintiff,**

v.

**PAPER–PAK INDUSTRIES, Defendant.**

No. 4:11–cv–203 RP–CFB.

United States District Court,
S.D. Iowa,
Central Division.

Dec. 20, 2011.

Timothy J. Zarley, Zarley Law Firm PLC, Des Moines, IA, for Plaintiff.

Joseph R. Dosch, Kevin M. Fee, Savan N. Vaghani, Sidley Austin LLP, Chicago, IL, Mark McCormick, David Wayne Nelmark, Belin McCormick, P.C., Des Moines, IA, for Defendant.

## ORDER

ROBERT W. PRATT, District Judge.

Currently before the Court is a motion to dismiss filed by Defendant Paper–Pak Industries ("PPI") on October 28, 2011. Clerk's No. 25. Plaintiff CO2 Technologies, Inc. ("CO2") filed a response in opposition to the motion on November 17, 2011. Clerk's No. 30. PPI filed a reply on December 2, 2011. Clerk's No. 37. CO2 filed a sur-reply on December 12, 2011. Clerk's No. 38–1.[1] The matter is fully submitted.

## I. FACTUAL & PROCEDURAL BACKGROUND

On June 1, 2005, PPI and CO2 entered into an agreement (hereinafter "the Agreement") "related to CO2's proprietary technology and related ingredients that are effective in enhancing shelf life and limiting microbial growth with respect to various foods and other organic goods, including meat and poultry products." Second Am. Compl. ¶ 13. Subject to certain restrictions, the Agreement grants PPI "a worldwide right and license to use the Technology and the Ingredients in the Meat and Poultry Market ... such license shall be exclusive (later amended to nonexclusive) for the Meat and Poultry Market in the U.S. and nonexclusive for the remainder of the world." *Id.* ¶ 14; *see also* Clerk's No. 22–1 at 1 (Agreement ¶ 2).

The Agreement defines "Technology" and "Ingredients" as follows:

> **Technology and Ingredients Defined.** Licensor represents and warrants that It owns, or has the right to operate under and grant rights with respect to,

the patents, related know-how and other technology described in <u>Schedule A</u> (the "**Technology**"). Licensor further represents and warrants that it owns, or otherwise has the right to make, use and sell (and to grant rights to make, use and sell) the products incorporating the Technology also described in Schedule A (the "**Ingredients**").

Clerk's No. 22–1 at 1 (Agreement ¶ 1). Schedule A describes the following "Technology" and "Ingredients":

> **Technology:** the technology covered by the claims of U.S. Patents 6,340,654 and 6,797,235 and the related proprietary know-how.
>
> **Ingredients:**
>
> **Citric Acid**
>
> **Cinnamic Acid**
>
> **Calcium Carbonate Sodium Bicarbonate**

*Id.* at 4.

Additionally, the Agreement states:

> Notwithstanding the parties' respective rights under this license Agreement, both Licensor and Licensee are entering into this License Agreement fully committed to work diligently and in good faith to support Licensee's efforts to develop the relevant markets for "active pads". In this spirit, Licensor and Licensee agree to refrain from any actions which would substantially inhibit the ability of either party from gaining the benefit from this License Agreement. Without limiting the generality of the foregoing, Licensee will respect the restrictions and other provisions set forth in Schedule B; and Licensor will not sell the **Ingredients** nor license the **Tech-**

---

**1.** This filing is actually an attachment to CO2's motion for leave to file a sur-reply. *See* Clerk's No. 38. On December 14, 2011, United States Magistrate Judge Celeste F. Bremer ordered the case manager to "detach and

separately file" the sur-reply, *see* Clerk's No. 40; however, as of this writing, the sur-reply has not yet been separately filed. However, the Court considers CO2's sur-reply to be submitted for the purposes of this order.

**nology** (other than pursuant to obligations to the Existing Customers as defined in Schedule B) to any third party for use in the **Meat and Poultry Market** unless and until this License Agreement is terminated as provided herein.

*Id.* at 2 (Agreement ¶ 4(c)) (nonstandard punctuation in original). The Agreement also contains an integration clause providing that it "constitutes the entire agreement of the parties with respect to the subject matter hereof and may only be changed by written agreement signed by both parties." *Id.* at 3 (Agreement ¶ 8).

In an August 21, 2005 email to the CO2 Board of Directors, Ron Jensen ("Jensen") stated, on behalf of PPI, that "[w]hile we do have constituents in our offering that are in addition to CO2's, none of these constituents have in any way impeded the launch of the CO2 constituent." Second Am. Compl. ¶ 20. In a January 16, 2006 email to CO2 President Wes Boldt ("Boldt"), Jensen stated that "[a]s of today, we have 33 supermarket trials ongoing in January and February. These include some of the biggest players in the industry. All of these pads use CO2 constituent." *Id.* ¶ 21.

In February 2006, the parties agreed to modify certain terms of the Agreement in order to, *inter alia,* convert the license, which originally was an exclusive license, into a non-exclusive license. *See* Clerk's No. 22–1 at 7. On June 21, 2007, Jensen sent a letter to Boldt stating that PPI "has devoted considerable resources and funds to the development of the market for our ULTRA ZAP® XTENDAPAK active pad, which is the sole product we sell using your [CO2's] active CO2 generating ingredient." *Id.* ¶ 22.

However, on February 4, 2011, "Charles Ruggiero, on behalf of [PPI] stated that 'the XtendaPak™ product line does not

use any technology covered by the ... Agreement' and stated that '[w]e will need to address the return of past payments made by PPI to your client [i.e., CO2].'" *Id.* ¶ 23. Around this same time, PPI began "manufacturing and selling pads containing the licensed Technology and Ingredients without CO2's consent to the produce industry and without paying a royalty for pads sold to the Meat and Poultry Industry." *Id.* ¶ 25.

## II. LAW AND ANALYSIS

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). In reviewing a complaint, a court must "accept as true all of the factual allegations contained in the complaint," and must draw "all reasonable inferences ... in favor of the plaintiff." *Schaaf v. Residential Funding Corp.,* 517 F.3d 544, 549 (8th Cir.2008) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

*Twombly,* 550 U.S. at 570, 127 S.Ct. 1955. "The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility.' It is not, however, a 'probabil-

ity requirement.'" *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Iqbal*, 129 S.Ct. at 1949).

■ In *Ashcroft v. Iqbal*, the Supreme Court described a "two-pronged approach" for evaluating complaints challenged under Rule 12(b)(6). *Iqbal*, 129 S.Ct. at 1949–50. First, a court should divide the allegations between factual and legal allegations; factual allegations should be accepted as true, but legal allegations should be disregarded. *Id.* Second, the factual allegations must be parsed for facial plausibility. *Id.* at 1950. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949.

## A. *Count 1*

In Count 1, CO2 alleges that PPI:

has breached, beginning in at least February of 2011, and continues to breach, the valid and enforceable ... Agreement of June 1, 2005, at least by manufacturing and selling pads containing the licensed Technology and Ingredients without CO2's consent to the produce industry and without paying a royalty for pads sold to the Meat and Poultry Industry in violation of paragraphs 2 and 3 of the ... Agreement.

Second Am. Compl. ¶ 25. PPI argues that Count 1 should be dismissed "to the extent it is based on allegedly unauthorized sales" because "[t]he primary alleged conduct about which Count 1 complains—selling licensed technology outside the meat and poultry industry—does not breach any sec-

tion of the Agreement." Def.'s Br. at 1, 7 (Clerk's No. 28–1).

In support of this argument, PPI notes that the Agreement contains no express "restriction on using the covered technology outside the meat and poultry markets." *Id.* at 7 (internal quotation marks omitted). CO2 does not seriously dispute this contention; however, it argues that it is still entitled to bring a claim for breach of contract. *See* Pl.'s Br. at 5 (Clerk's No. 30). Specifically, CO2 argues that in the Agreement, it "granted much more than a patent license," including "the right to use proprietary know-how related to the patents and other technology." *See id.* According to CO2, "[i]n contrast to a license dealing solely with a patent, when the license is based upon a grant of technical information and the licensee exceeds the terms of the grant, the appropriate remedy is a suit for breach of contract based on an implied covenant not to do so." *Id.* (citing *Eli Lilly & Co. v. Emisphere Techs., Inc.*, 408 F.Supp.2d 668 (S.D.Ind. 2006) (comma omitted)).

In response, PPI argues that "the mere fact that the Agreement mentions 'know-how' ... does not trump the well-established rule against reading nonexistent covenants into a license agreement." Def.'s Reply at 4 (Clerk's No. 37). PPI asserts that "[c]ourts will only imply covenants into an integrated contract 'when the implied term is not inconsistent with some express term of the contract, and where there arises from the language of the contract itself ... an inference that it is *absolutely necessary*[ ] to introduce the term to effectuate the intention of the parties.'"[2] Def.'s Br. at 8 (quoting *B & J Mfg. Co. v.*

---

2. PPI observes that, in Schedule B, the Agreement includes a number of express restrictions but does not list a restriction against sales outside the "Meat and Poultry Market." *See* Def.'s Br. at 8–9. Therefore, PPI argues that an implied covenant not to exceed the scope of the license would be inconsistent

with the terms of the Agreement. *See id.* at 9. The Court does not agree. PPI has failed to identify any *"express* term" of the contract that is actually *inconsistent* with an implied covenant not to exceed the scope of the license. *See B & J Mfg. Co. v. Hennessy Indus.,*

*Hennessy Indus., Inc.*, No. 73 C 2174, 1976 WL 21072, at *3 (N.D.Ill. Oct. 19, 1976) (ellipsis in PPI's brief)).

■ As an initial matter, the law on this issue is not nearly as clear as PPI's arguments suggest. PPI relies on one non-binding[3] line of cases where courts have refused to read negative covenants (i.e., covenants not to exceed the scope of the license) into patent licenses. *See* Def.'s Br. at 7–8 (citing *B & J Mfg.*, 1976 WL 21072, at *3, and *Fla. Canada Corp. v. Union Carbide & Carbon Corp.*, 280 F.2d 193, 194–95 (6th Cir.1960)). However, there is also non-binding authority that supports CO2's position. *See Eli Lilly & Co. v. Emisphere Techs., Inc.*, 408 F.Supp.2d 668, 687–90 (S.D.Ind.2006) (discussing the various conflicting authorities including, *e.g., Shaw v. E. I. DuPont De Nemours & Co.*, 126 Vt. 206, 226 A.2d 903 (1967), *aff'd following rehearing*, 152 U.S.P.Q. 723 (1967)). In this case, CO2 alleges that it granted technical know-how in addition to the patent licenses.[4] *See* Second Am. Compl. ¶ 13 (referring to a license of CO2's "proprietary technology,"

not just license for the patents); *id.* ¶ 15 (alleging that CO2 conveyed a right to use "related know-how," not just a license for the patents). Therefore, CO2's claim falls outside the "straight patent license" cases upon which PPI relies.[5] *See B & J Mfg.*, 1976 WL 21072, at *1 (dealing with a license for patents only, not for related technical information); *Fla. Canada Corp.*, 280 F.2d at 194 (dealing with a settlement agreement related to a previous patent license); *see also Eli Lilly*, 408 F.Supp.2d at 688 ("[S]hould the license be based upon a grant of technical information, then the balance tips in the opposite direction. Here the licensor has granted more than a mere forbearance from suit. He has actually delivered a package of valuable information to the licensee. Should the licensee exceed the terms of the grant, the sole appropriate remedy is a suit for breach of contract based on an implied covenant not to do so." (quoting Einhorn, *Patent Licensing Transactions* § 1.03[4] (2004)). In other words, contrary to PPI's suggestion, not all of CO2's alleged rights could be fully and fairly vindicated by a claim for

---

*Inc.*, No. 73 C 2174, 1976 WL 21072, at *3 (N.D.Ill. Oct. 19, 1976).

3. The Agreement states that it "shall be governed by the laws of Illinois." Clerk's No. 22–1 at 3 (Agreement ¶ 8). Neither party argues that some other state's law should apply; therefore, the Court will apply Illinois law.

4. PPI argues that the term "know-how" merely describes "the patented technology [CO2] had the right to license." *See* Def.'s Reply at 4. However, this argument contradicts the express terms of the agreement, which lists the patents and the "know-how" separately. Clerk's No. 22–1 at 4. Moreover, because this is a motion to dismiss, the Court must take CO2's allegations as true and cannot consider PPI's suggestion that, in fact, nothing more than the patent licenses were conveyed.

5. These cases are distinguishable in other respects as well. For example, the agreement

in *Florida Canada Corp.* expressly barred any implied covenants. *See* 280 F.2d at 195. And, importantly, the decision in *B & J* was based on the specific facts and circumstances of that case, including the plaintiff's failure to present evidence on certain issues. *See* 1976 WL 21072, at *4. If anything, these cases—both of which were decided on motions for summary judgment—indicate that the existence of a negative implied covenant depends on the facts and evidence, not (as PPI suggests) on abstract principles of law. *See id.* at *3 (noting that "the circumstances under which [the agreement] was entered into" is relevant to determining whether a negative covenant exists); *see also generally Eli Lilly & Co. v. Genentech, Inc.*, Nos. IP 87–219–C, IP 88–1463–C, 1990 WL 305392, at *3–5 (S.D.Ind. July 17, 1990) (discussing the fact-intensive nature of the analyses in *Florida Canada Corp.* and *B & J*).

patent infringement. *See* Def.'s Br. at 7. For all of these reasons, and taking all of CO2's allegations as true, the Court simply cannot say that CO2 has failed to state a plausible claim in Count 1. Therefore, Count 1 shall not be dismissed.

### B. *Count 2*

In the alternative, CO2 alleges that it entered into the Agreement, in part, "to penetrate the Meat and Poultry Market through [PPI]'s established market position." [6] Second Am. Compl. ¶ 29. According to CO2, PPI "did not penetrate the Meat and Poultry Market on behalf of CO2" and, therefore, breached ¶ 4(c) of the Agreement. *Id.* ¶ 30. PPI argues that Count 2 should be dismissed because "the Agreement provides no recourse for disappointment in sales activity." [7] Def.'s Br. at 10. According to PPI, the Agreement "grants [it] the *right* to sell certain patented technology . . . but it does not force PPI to sell anything, let alone specify a minimum sales level." *Id.*

In response, CO2 argues that its "primary reason for entering into the . . . agreement and sharing its proprietary know-how with PPI was to take advantage of PPI's established market position in order to penetrate the Meat and Poultry Market." Pl.'s Br. at 6 (citing Clerk's No. 22–1 at 1 (Agreement Preamble) ("WHEREAS, Licensor desires to penetrate the **Meat and Poultry Market**

through Licensee's established market position. . . .")). Thus, according to CO2, "the benefit sought was to get CO2's product to the desired market more quickly than it could do . . . by itself or through another licensee" and "[i]n this context, PPI agreed to refrain from any actions which would substantially inhibit the ability of either party from gaining the benefit from the . . . Agreement." *Id.* at 6–7 (citing Clerk's No. 22–1 at 2 (Agreement ¶ 4(c))). CO2 asserts that "PPI did not refrain as promised" because it "mislead CO2 by indicating that PPI was developing CO2's technology for the Meat and Poultry Industry." *Id.* at 7. However, "[a]fter relying upon these and other acts and statements, CO2 learned on February 4, 2011 that PPI's XtendaPak™ product line does not use any of the technology covered by the . . . Agreement." *Id.* (citing Second Am. Compl. ¶ 23). CO2 asserts that if it had "known its technology was not being promoted, [it] would have terminated the Agreement and licensed to others to promote the product," but did not do so "as a result of the misleading statements." *Id.* Thus, according to CO2, it has stated a valid claim for breach of ¶ 4(c) of the agreement. *See id.*

As PPI points out in its reply, CO2's arguments do not entirely match its allegations. *See* Def.'s Reply at 7. CO2 has not alleged that it relied on these misrepresentations—i.e., it would have terminated the

---

**6.** PPI repeatedly suggests that the mere fact that CO2 pled this alternative theory of breach somehow undermines the viability of both of its breach of contract claims. *E.g.,* Def.'s Br. at 9. This type of argument is entirely unpersuasive. Parties are expressly permitted to plead alternative claims, *see* Fed. R.Civ.P. 8(d)(2); therefore, the Court declines to read any negative implication into the fact that CO2 has chosen to take advantage of this form of pleading.

**7.** PPI also argues that Count 2 "is too vague to state a claim for relief: it is not clear

whether Plaintiff is alleging that PPI failed to sell its technology within the Meat and Poultry market, that it failed to sell enough of PPI's technology, or that it otherwise failed to meet some unspecified and undefined standard of 'market penetration.' " Def.'s Br. at 9. Therefore, according to PPI, it "cannot defend against" Count 2. *Id.* However, if PPI truly believes that Count 2 is "so vague or ambiguous that [it] cannot reasonably prepare a response," then it should have filed a motion for a more definite statement. *See* Fed.R.Civ.P. 12(e).

Agreement (or taken other actions to penetrate the market) but for the alleged misrepresentations. *See id.*; Second Am. Compl. ¶¶ 1–32. In its sur-reply, CO2 argues that it did not have to plead "reliance and ... inaction" because "they are not elements of a breach of contract claim." Pl.'s Sur–Reply at 4.

■ Thus, as best as the Court can discern from CO2's rather opaque briefs, it appears that CO2's theory is that the Agreement required PPI to refrain from harming CO2's ability to benefit from the Agreement and that PPI did such harm by misleading CO2 about its use (or rather, nonuse) of CO2's technology in PPI's product development. *See id.* However, Count 2 does not actually allege that any of PPI's statements were misleading. *See* Second Am. Compl. ¶ 23 (alleging that Ruggiero's February 2011 statement was "in contrast to ... Jensen's previous statements," but not alleging that "Jensen's previous statements" were either false or meant to mislead). Moreover, the plain language of Count 2 alleges that the breach is based upon a failure to "*penetrate* the Meat and Poultry Market," with no mention of any misleading statements or actions. *Id.* ¶ 30 (emphasis added); *see also id.* ¶¶ 28–29, 31–32. Thus, Count 2 does not state a claim under the theory CO2 currently asserts. Accordingly, Count 2 shall be dismissed.

### III. CONCLUSION

For the foregoing reasons, "Defendant Paper–Pak Industries' Motion to Dismiss Plaintiff's Second Amended Complaint" (Clerk's No. 25) is GRANTED in part and DENIED in part. Count 2 is hereby dismissed without prejudice.

IT IS SO ORDERED.