WILKINSON, Circuit Judge,
dissenting:
If ever there were a case that failed to satisfy the plausibility standard on a Rule 12(b)(6) motion to dismiss, it is this one. BNT presents nothing more than bare speculation that racial discrimination influenced the City’s treatment of its loan application. To the contrary, the minority-owned status of the business motivated the City to extend the loan in the first place. The complaint manifests that nothing but prudent, neutral, non-racial lending practices were at issue here. The dismissal was absolutely justified and I would affirm the district court.
I.
The majority ignores the whole point of Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Those two decisions make clear that a well-pleaded complaint must allege “enough facts to state a claim to relief that is plausible on its face.” Twombly, 550 U.S. at 570, 127 S.Ct. 1955; see Iqbal, 556 U.S. at 679, 129 S.Ct. 1937 (“[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss.”). In other words, “[f|actual allegations must be enough to raise a right to relief above the speculative level.” Twombly, 550 U.S. at 555, 127 S.Ct. 1955. This “requires more than labels and conclusions,” id., because the court must be able to “draw the reasonable inference that the defendant is liable of the misconduct alleged,” Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. And as relevant here, a claim may fail to reach this threshold if some “obvious alternative explanation” exists. Twombly, 550 U.S. at 567, 127 S.Ct. 1955.
The distinction that Twombly and Iqbal draw between plausibility and mere possibility means this: in cases where there is no more than bald conjecture of impermissible animus, the claim should be dismissed at the pleading stage. Discovery is an expensive and cumbersome process that parties should not frivolously be forced to undertake. See id. at 557-60, 127 S.Ct. 1955. “So, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court.” Id. at 558, 127 S.Ct. 1955 (internal, quotation marks omitted).
BNT has not met even the most permissive reading of these pleading requirements.
II.
There can be no mistake that the City in fact approved BNT’s request for a loan. *654 Michael and Ramona Woods, the owners of BNT, “discussed with various City of Greensboro officials what a successful minority owned Greensboro-based television network would mean to the Greensboro community.” J.A. 12-13. It is undisputed that City officials actually “suggested and recommended” that BNT apply for funding to facilitate production of its situational comedy, ‘Whatcha Cookin.” J.A. 13. City officials then assisted BNT in framing the loan application, and the City Council later discussed “the desire to support minority owned small businesses.” J.A. 129. In both word and deed, the City encouraged BNT’s endeavor.
The City, however, conditioned its approval of the loan on a number of factors. These included a title search confirming that there were no liens beyond the first mortgage on the property that secured the loan, that the current mortgage debt outstanding on that collateral did not exceed $509,000, and that the City’s interest in the collateral would be prioritized at no worse than a second lien. J.A. 92. BNT failed to meet these conditions and petitioned the City to amend the specified terms, which the City refused to do. Although BNT alleges that it was unable to obtain a loan due to racial discrimination, an “obvious alternative explanation” for the City’s action is immediately clear from the face of the complaint. See Twombly, 550 U.S. at 567, 127 S.Ct. 1955. BNT simply did not satisfy prudent, neutral, non-racial loan conditions for eight months while the loan resolution was in place.
BNT alleges no direct evidence of racial bias, nor does it assert that any such evidence exists. Instead, BNT searches under bushes to propose additional facts from which animus might be inferred. BNT argues that there was sufficient equity in the collateral to secure the loan regardless of whether the City assumed a second or third lien. BNT also claims that the City has provided larger loans under equally or less favorable conditions to non-minority borrowers. BNT reasons, therefore, that the only remaining explanation for why it was unable to obtain a loan is presumptively discrimination. I disagree. This is the very type of baseless pleading that Twom-bly and Iqbal were meant to foreclose.
Home values, like any investment, can be volatile. Any lender knows the difference between a second and third lien: being second in line is better than being third. The City simply did not wish to wait behind two other outstretched hands in the event of a default. Recovery on any loan is never entirely certain. And BNT further overlooks that the Woods, who provided the collateral, failed even to convey to the City the true nature and amount of their debt obligation in the first place. Both parties encouraged the district court to consider the City Council minutes concerning the loan. Woods v. City of Greensboro, No. 1:14CV767, 2015 WL 8668228, at *3 n.5 (M.D.N.C. Dec. 11, 2015). These minutes show that the City was unaware of the pre-existing second lien on the property that was offered as security. Ramona Woods responded to the City Council that “she had not intended to not disclose her loan positions.” J.A. 129. But the City cannot be blamed for refusing to amend the terms of a loan upon finding that the collateral was more encumbered, both in the number and total debt obligation of outstanding liens, than the City had originally been led to believe.
The district court correctly observed that “the specific security position of the City is a financial decision that is not immediately subject to drawing inferences of racial discrimination.” Woods, 2015 WL 8668228, at *10. Assuming that BNT could establish every fact alleged in the com *655 plaint, it would still be insufficient to plausibly support a finding of unlawful animus.
Although BNT references numerous other loans approved by the City, these loans provide no plausible route by which BNT can establish discriminatory intent. Whether a loan is a valid comparator is a legal conclusion for which the parties are not entitled to deference at the pleading stage. See Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (“Although for the purposes of a mo-tioni to dismiss we must take all of the factual allegations in the complaint as true, we ‘are not bound to accept as true a legal conclusion couched as a factual allegation.’ ” (quoting Twombly, 550 U.S. at 555, 127 S.Ct. 1955)). The district court was quite correct to note that the provided examples primarily “involve either grant money, rather than loan money, City Council decisions that were made after a loan had already been disbursed, or a differently constituted City Council.” Woods, 2015 WL 8668228, at *10. The supposed comparators are so far afield that almost any approval of a loan to a non-minority business could subject the City to a lawsuit.
BNT makes mention of an $850,000 loan made by the City to Kotis Holdings in January 2013. It argues that this loan, secured by a third lién and nearly three times the size of the loan BNT requested, is evidence that BNT was denied its loan due to racial bias.
But BNT forgets that the Kotis loan was part of a new incentive program offered to a local developer, not an economic development loan to a private business for goods and services. In other words, these loans differed in kind. BNT also failed to provide any indication as to the amount of available equity in the asset that secured the Kotis loan, which would be essential to establish a comparison. Moreover, the Ko-tis loan was initially approved with a third lien, whereas the City likely felt misled when BNT asked to renegotiate the basic terms of its loan after the loan was approved.
The majority surmises that BNT just might somehow conceivably manage to prevail. Yet the complaint itself makes clear that basic, elemental lending prudence was at work here. “As between that ‘obvious alternative explanation’ ... and the purposeful, invidious discrimination [the plaintiff] asks us to infer, discrimination is not a plausible conclusion.” Iqbal, 556 U.S. at 682, 129 S.Ct. 1937 (quoting Twombly, 550 U.S. at 567, 127 S.Ct. 1955). BNT has therefore “not nudged [its] claims across the line from conceivable to plausible.” Twombly, 550 U.S. at 570, 127 S.Ct. 1955. Even assuming all the facts alleged, BNT “stops short of the line between possibility and plausibility,” id. at 557, 127 S.Ct. 1955, and fails to present “more than a sheer possibility that a defendant has acted unlawfully,” Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.
III.
The majority is certainly right that racial prejudice in this society is persistent and that its modern incarnation may take more subtle forms. There is another side to this story, however, which Twombly and Iqbal serve to underscore. Promiscuous accusations of racial prejudice, as exemplified by this complaint, are diminishing the perceived gravity of those unfortunate situations where racial discrimination must be confronted and still does occur. Careless racial accusations carry a distinctive sting and visit an especial hurt that serves only to estrange and separate: Americans will eschew racial interactions that carry a risk of accusation when no unlawful animus is afoot. Allowing complaints such as this to go forward trivializes, sadly, the imperishable values our civil rights laws *656 embody. A separatism born of unfounded accusations and pervasive racial attributions cannot be the society to which I or my fine colleagues in the majority aspire.
Courts should respect responsible deci-sionmaking rather than strip cities of sound lending practices just because a party injects race into the equation. It is no secret that municipal budgets are severely strained: the City should be respected both for seeking to extend a loan to BNT and for refusing to amend the associated conditions when, unexpectedly, its lien position turned more precarious.
The City Council minutes reveal that being a minority business was a plus here. J.A. 129; see Woods, 2015 WL 8668228, at *8 (“Given that it appears from the [minutes] that the initial Resolution was approved in part because Plaintiffs are minorities, it is implausible that they were later denied a loan because of the same consideration.”). The City openly wished to grant this loan to BNT and went to great lengths to help BNT prepare the loan application. The fact that the loan was actually approved shows that it was something the City wanted to do. BNT now faults the City for following sound and accepted lending practices. It would appear that no good deed goes unpunished: clichés, as the saying goes, sometimes become clichés because they are true.