# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Maria Povacz,     :
    Petitioner   :
          :
 v.        :   No. 492 C.D. 2019
          :
Pennsylvania Public Utility  :
Commission,     :
    Respondent :

Laura Sunstein Murphy,   :
    Petitioner   :
          :
 v.        :   No. 606 C.D. 2019
          :
Pennsylvania Public Utility  :
Commission,     :
    Respondent :

Cynthia Randall and Paul Albrecht, :
    Petitioners  :
          :
 v.        :   No. 607 C.D. 2019
          :
Pennsylvania Public Utility  :
Commission,     :
    Respondent :   ARGUED:  June 10, 2020


BEFORE:  HONORABLE MARY HANNAH LEAVITT, President Judge
      HONORABLE PATRICIA A. McCULLOUGH, Judge
      HONORABLE MICHAEL H. WOJCIK, Judge
      HONORABLE CHRISTINE FIZZANO CANNON, Judge
      HONORABLE ELLEN CEISLER, Judge
      HONORABLE J. ANDREW CROMPTON, Judge

OPINION BY JUDGE CEISLER      FILED:  October 8, 2020

   Petitioners, Maria Povacz, Laura Sunstein Murphy, and Cynthia Randall and

Paul Albrecht (collectively, Consumers) are individual electricity consumers

receiving electricity distribution services from PECO Energy Company, formerly the Philadelphia Electric Company (PECO). In these consolidated petitions for review, Consumers seek review of denials by Respondent, the Pennsylvania Public Utility Commission (PUC), of Consumers' requests to be exempted from installation by PECO of wireless smart electric meters in or on their homes. PECO has intervened in the action. After thorough review, we affirm the PUC's decisions in part, reverse and remand in part, and vacate and remand in part.

## I. Background

Consumers are customers in PECO's electricity service area. They claim they are hypersensitive to emissions of radiofrequency electromagnetic energy (RF).[1,2] They have health issues they contend are or may be worsened by RF exposure. They have taken extraordinary measures to eliminate RF in their home environments and to minimize their RF exposure elsewhere. They provided expert medical evidence from their treating physicians that their exposure to RF should be minimized in order to avoid risks of harm to their health. They also offered expert testimony that emerging research indicates health risks at much lower levels of RF exposure than current federal regulations allow.

Consumers currently have automatic meter reading (AMR) meters at their homes. Consumers received notices from PECO that wireless smart meters[3] would be installed in or on their homes to replace their current electric meters. They

---

[1] The Federal Communications Commission has a radiofrequency electromagnetic energy (RF) Safety FAQ web page here: https://www.fcc.gov/engineering-technology/electromagnetic-compatibility-division/radio-frequency-safety/faq/rf-safety#Q5 (last visited October 7, 2020). The web page contains information about potential effects of RF exposure.

[2] As the Public Utility Commission (PUC) explained in its decisions, the term "electromagnetic field" (EMF), which also appears in the record, is synonymous with RF.

[3] Wireless smart meters are also known as advanced metering infrastructure (AMI) meters.

informed PECO that they would not allow installation of the replacement meters because of the RF emitted by wireless smart meters. PECO notified them that their electricity would be cut off entirely unless they allowed installation of wireless smart meters. Consumers then filed complaints with the PUC seeking to avoid forced installation of wireless smart meters in or on their homes.

An administrative law judge (ALJ) sustained, in part, PECO's preliminary objections to the complaints. The ALJ found that opting out of smart meter installation was not an available remedy under the law. However, the ALJ allowed the complaints to go forward for determinations of whether the individual Consumers were entitled to accommodations in light of their health issues.

After several omnibus hearings, the ALJ found one of the Consumers, Maria Povacz, had demonstrated a *prima facie* case that attaching a smart meter to her home would exacerbate her health condition. The ALJ ordered PECO to move Ms. Povacz's meter socket away from her house[4] and absorb the cost of moving it. The ALJ otherwise denied relief to Ms. Povacz. The ALJ denied all relief to the other Consumers.

Consumers filed exceptions with the PUC. PECO filed exceptions to the portion of the ALJ's decision regarding Ms. Povacz that required relocation of her

---

[4] PECO has, albeit reluctantly, accommodated at least one other customer with health concerns by moving his smart meter away from his home. *See*, *e.g.*, *Benlian v. PECO Energy Corp.* (E.D. Pa., No. 15-1218, filed July 20, 2016), slip op. at __, 2016 U.S. Dist. LEXIS 95082, at *10. In *Benlian*, a disabled veteran, after prior notice to PECO, removed a smart meter from his home and replaced it with an analog meter because he claimed he began suffering from additional health issues after installation of the smart meter. Although PECO allegedly agreed to install a smart meter on a pole away from the house, it did not do so. Instead, PECO shut off the electricity to the home, notwithstanding the plaintiff's known, medically documented dependence on breathing equipment that required electricity, because he would not allow reinstallation of the smart meter on the house. Following the intervention of a Veterans' Administration social worker and a township supervisor, PECO eventually installed a smart meter on a pole away from the house, after leaving the home without power for several weeks.

meter. The PUC overruled Consumers' exceptions, granted PECO's exception, and denied all relief to Consumers. Consumers then filed petitions for review in this Court.

## II. Issues

Consumers raise six interrelated issues on appeal,[5] all of which relate to Consumers' desire to avoid RF emissions that would result from having wireless smart meters installed in or on their homes. Their arguments on appeal are summarized as follows:

A.  The PUC's interpretation of the 2008 amendment to the PUC Code, known as Act 129,[6] as precluding opt-outs from installation of wireless smart meters violates Consumers' constitutional liberty interest in their personal bodily integrity.

B.  Contrary to the PUC's interpretation, Act 129 does not mandate installation of wireless smart meters in all homes and does not preclude the PUC from granting Consumers appropriate relief.

C.  Because electrical service must, by law, be both reasonable and safe, the PUC erred by requiring Consumers to prove wireless smart meters would be both unreasonable and unsafe, in that proving either in the disjunctive would entitle Consumers to relief.

D.  Regarding reasonableness, Consumers proved mandatory installations of wireless smart meters in their homes would be unreasonable in light of their sincere and medically supported concerns and in the absence of any

---

[5] This Court's review is limited to determining whether the Commission violated constitutional rights, committed an error of law, rendered a decision not supported by substantial evidence, or violated its rules of practice. *Romeo v. Pa. Pub. Util. Comm'n*, 154 A.3d 422 (Pa. Cmwlth. 2017).

[6] Act of October 15, 2008, P.L. 1592, No. 129, 66 Pa. C.S. § 2807.

4

compelling reason to impose the wireless meter requirement without exceptions.

E.     Regarding safety, the PUC applied an incorrect burden of proof by requiring Consumers to show a conclusive causal connection between RF exposure and adverse health effects, rather than simply showing a risk of harm.

F.     Had the PUC applied the correct burden of proof, it would have been compelled to find the installation of wireless smart meters would be unsafe for Consumers.

## III. Discussion

## Act 129

Act 129 was enacted to reduce energy consumption and demand. *Romeo v. Pa. Pub. Util. Comm'n*, 154 A.3d 422 (Pa. Cmwlth. 2017). Act 129 addresses electric distribution and default service provider responsibilities, including smart meter technology. 66 Pa. C.S. § 2807(f); *Romeo*, 154 A.3d at 424. PECO is a privately owned utility and functions as a distribution and default service provider in its service area. Thus, Act 129 applies to PECO.

In pertinent part, Act 129 imposes the following requirements concerning an electric distribution company's obligations to furnish smart meter technology to its customers:

> (f) Smart meter technology and time of use rates.
>
> (1) Within nine months after the effective date of this paragraph, electric distribution companies shall file a smart meter technology procurement and installation plan with the commission for approval. The plan shall describe the smart meter technologies the electric distribution company proposes to install in accordance with paragraph (2).
>
> (2) *Electric distribution companies shall furnish smart meter technology* as follows:

5

(i) Upon request from a customer that agrees to pay the cost of the smart meter at the time of the request.

(ii) In new building construction.

(iii) In accordance with a depreciation schedule not to exceed 15 years.

66 Pa.C.S. § 2807(f) (emphasis added).

Act 129 defines "smart meter technology" as follows:

(g) *Definition.*--As used in this section, the term "smart meter technology" means technology, including metering technology and network communications technology capable of bidirectional communication, that records electricity usage on at least an hourly basis, including related electric distribution system upgrades to enable the technology. The technology shall provide customers with direct access to and use of price and consumption information. The technology shall also:

(1) Directly provide customers with information on their hourly consumption.

(2) Enable time-of-use rates and real-time price programs.

66 Pa.C.S. § 2807(g).

### A. Constitutional Interest in Bodily Integrity

The Fourteenth Amendment provides, in pertinent part: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law. . . ." U.S. CONST. amend. XIV, § 1. Consumers contend they have a constitutional liberty interest in their personal bodily integrity under the Fourteenth Amendment's due process clause. They argue this is a fundamental right which the government violates when its own actions create the violative condition.

RF is a measurable physical force. Consumers reason that forcing them to endure involuntary exposure to such a force implicates their fundamental liberty interest in personal bodily integrity. Forgoing electricity service completely is not a

6

feasible option.[7]  Also, very few states other than Pennsylvania have precluded opt-outs from smart meter installation.[8]  Therefore, Consumers assert that this Court should interpret Act 129 so as to avoid the constitutional issue they claim is raised by the PUC's interpretation.[9]

The PUC's decision gave comparatively little attention to this issue.  It observed that Fourteenth Amendment due process requires only notice and an opportunity to be heard.  Then, based on its conclusion that Consumers failed to prove they would suffer adverse health effects from installation of wireless smart meters in their homes, the PUC found Consumers failed to show that forced RF exposure from the meters would violate "basic principles of respect for bodily integrity."  *Povacz v. PECO Energy Co.* (Pa. P.U.C., No. C-2015-2475023, filed Mar. 28, 2019), slip op. at 99-100.

---

[7] Nonetheless, it is notable that along with Consumers' complaints to the PUC, a fourth complaint was initially filed by Stephen and Diane Van Schoyck.  However, the Van Schoycks later removed their home completely from the electric grid and withdrew their complaint against PECO.

[8] Exhibit F to the *amicus* brief of Friends of Merrymeeting Bay✱ (Merrymeeting) contained a listing, with citations of authority, of the 40 states that have so far approved consumer opt-outs from wireless smart meter requirements.  PECO moved to exclude portions of the *amicus* brief that relied on information not part of the agency record.  This Court granted PECO's request with regard to issues raised by Merrymeeting that were not preserved before the PUC, including the information in Exhibit F to its *amicus* brief.

> ✱ Merrymeeting is a conservation organization with a mission "[t]o preserve, protect, and improve the unique ecosystems of Merrymeeting Bay," a "[m]id-coast Maine riverine delta consisting of the Kennebec, Androscoggin, Cathance, Muddy, Eastern and Abagadasset Rivers and surrounding towns."  *See* http://www.friendsofmerrymeetingbay.org/ (last visited October 7, 2020).  What, if any, interest this organization has in this litigation is not clear.

[9] Constitutional protections apply against state actors.  PECO is not a state actor in relation to its installation of smart meters and provision of electricity to its customers.  *Benlian*, slip op. at __, 2016 U.S. Dist. LEXIS 95082, at *16-*19.  Hence, Consumers assert their constitutional argument only against the PUC.

7

In *Naperville Smart Meter Awareness v. City of Naperville*, 69 F. Supp. 3d 830 (N.D. Ill. 2014) (*Naperville II*), a federal court addressed the same issue Consumers raise here. The federal court explained the right at issue as follows:

> The Fourteenth Amendment provides that the government shall not "deprive any person of life, liberty, or property without due process of law." U.S. [CONST.] [a]mend. XIV. But "there can be no claim of a denial of due process, either substantive or procedural, absent deprivation of either a liberty or a property right." *Eichman v. Ind. State Univ. Bd. of Tr[ustee]s[]*, 597 F.2d 1104, 1109 (7th Cir. 1979). Furthermore, the right to "substantive due process is 'very limited,'" *Viehweg v. City of Mount Olive*, 559 F. App'x 550, 552 (7th Cir. 2014) (quoting *Tun v. Whitticker*, 398 F.3d 899, 900 (7th Cir. 2005)), and the Due Process Clause "does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115 . . . (1992) (internal citations omitted). Furthermore, to survive a motion to dismiss a claim for deprivation of substantive due process, a plaintiff must allege facts tending to suggest that the government's action was arbitrary. *See Jeffries v. Turkey Run Consol. Sch. Dist.*, 492 F.2d 1, 3-4 (7th Cir. 1974).

*Id.* at 839.

The *Naperville II* court rejected the plaintiffs' Fourteenth Amendment bodily integrity argument because their complaint failed to "identify an arbitrary deprivation of a recognized liberty or property interest." *Id.*

First, the court found: "even assuming as true that [RF] waves emitted by smart meters are capable of causing harm, [plaintiffs'] allegations suggest only that the [c]ity negligently increased a risk of injury. Allegations of such risk exposure are insufficient to state a claim for deprivation of bodily integrity under the Fourteenth Amendment." *Id.* (citing *Upsher v. Grosse Pointe Pub. Sch. Sys.*, 285 F.3d 448, 453-54 (6th Cir. 2002) (asbestos under carpeting did not violate rights of bodily integrity); *Hood v. Suffolk City Sch. Bd.*, 469 F. App'x 154, 159 (4th Cir. 2012) (liberty interest in bodily integrity not violated by dangerous conditions in

8

school caused by excessive mold and bacteria); *Lewellen v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 34 F.3d 345 (6th Cir. 1994) (construction of school beneath dangerous high-voltage conductor line was not a constitutional violation of bodily integrity); *Goss ex rel. Goss v. Alloway Twp. Sch.*, 790 F. Supp. 2d 221, 227-28 (D.N.J. 2011) (design of cement playground, rather than safer non-cement playground, was not a deprivation of the liberty interest in bodily integrity)).

Second, the *Naperville II* court found that even assuming the plaintiffs' complaint had identified a cognizable liberty interest in their bodily integrity, their constitutional claim still was not viable, because they also failed to plead facts showing that the decision to implement the installation of smart meters was arbitrary. Rather, the court found, the plan was "part of a nationwide effort to modernize the electrical power grid, and the program's goals include increasing energy efficiency, reducing emissions, and lowering electricity consumption costs." *Id.* at 839-40. As such, it was not arbitrary, but rather, was "rationally and appropriately based on energy policy decisions within the purview of local government. . . ." *Id.* at 840.

The *Naperville II* court's analysis is persuasive, and we follow it here. We decline to recognize a viable claim by Consumers regarding a violation of their Fourteenth Amendment liberty interests in bodily integrity. We therefore affirm the PUC's decision on this issue.

### B. Act 129's Requirements

Consumers next challenge the PUC's conclusion that Act 129 mandates installation of wireless smart meters in all customers' homes. Consumers assert that the language of Act 129 does not require universal installation of wireless smart meters regardless of consumers' wishes. Therefore, the PUC is also incorrect in its

9

conclusion that it lacks authority to grant the appropriate relief Consumers seek.[10] This argument by Consumers is persuasive.

Act 129 mandates that an electric distribution company, such as PECO, "shall furnish smart meter technology . . . in accordance with a depreciation schedule not to exceed 15 years." 66 Pa.C.S. §2807(f)(2)(iii). However, nothing in the statutory language affirmatively mandates that customers must allow installation of wireless smart meters.[11]

To "furnish" means "to provide with what is needed; . . . supply, give." Webster's Ninth New Collegiate Dictionary 499 (1985). The definition does not imply that the recipient is forced to accept that which is offered. Therefore, we find the PUC is incorrect in concluding that Act 129 facially precludes any customer refusal of installation of smart meters.

Act 129 requires an electric distribution company to "furnish smart meter technology," 66 Pa.C.S. § 2807(f)(2)(iii), but does not require every customer to avail himself of every aspect of that technology. Notably, several provisions of Act 129 seem to contemplate customer choice in the degree to which the smart meter technology is used.

For example, Act 129 requires the ***customer's consent*** in order for the electric distribution company to allow either direct meter access or electronic access to the customer's meter data by third parties such as electric generation suppliers or providers of conservation and load management services. 66 Pa.C.S. § 2807(f)(3).

---

[10] In *Benlian*, a federal district court stated, without elaboration, that "Act 129 does not permit customers to opt out of the installation of smart meters and mandates that '[e]lectric distribution companies shall furnish smart meter technology.'" Slip op. at __, 2016 U.S. Dist. LEXIS 95082, at *3-*4. This Court, however, is not bound by a federal district court's interpretation of a Pennsylvania statute. *In re Stevenson*, 40 A.3d 1212 (Pa. 2012).

[11] Notably, "wireless" meters are not mentioned at all in the statute.

Accommodation of a customer's request to deactivate the meter's RF emissions would not be inconsistent with this provision, since information could not be shared with third parties without the customer's consent in any event.

Similarly, Act 129 requires an electric distribution company to develop time-of-use rates and real-time price plans and to "*offer* the time-of-use rates and real-time price plan to all customers that have been provided with smart meter technology under paragraph (2)(iii)." 66 Pa.C.S. § 2807(f)(5) (emphasis added). "Residential or commercial customers *may* elect to participate in time-of-use rates or real-time pricing." *Id.* (emphasis added). ***They are not required to do so.*** Again, accommodating a customer's request to avoid RF emissions would not violate the requirement to offer time-of-use rates and real-time price plans, since customers are not required to participate in such plans.

In addition, as Consumers correctly argue, Act 129's definition of "smart meter technology" leaves the door open for accommodations of customer requests to avoid RF emissions from smart meters. The language of the definition is consistently couched in permissive terms, as it relates to customers' use of the available smart meter technology:

> [T]he term "smart meter technology" means technology, ***including*** [(not necessarily limited to)] metering technology and network communications technology ***capable of*** [(not "requiring")] bidirectional communication, that ***records*** [(not "transmits")] electricity usage on at least an hourly basis, including related electric distribution system upgrades to enable the technology. The technology shall provide customers with direct ***access to and use of*** [(not mandatory use of)] price and consumption information. The technology shall also:
>
> > (1) Directly provide customers with information on their hourly consumption.

11

(2) ***Enable*** time-of-use rates and real-time price programs. [(As discussed above, customer is not required to participate.)]

(3) Effectively ***support*** [(not require)] the automatic control of the customer's electricity consumption by one or more of the following ***as selected by the customer***:

(i) the customer [(the customer retains control)];

(ii) the customer's utility; or

(iii) a third party engaged by the customer or the customer's utility.

66 Pa.C.S. § 2807(g) (emphasis added).

Notably, the PUC's own internet consumer information page concerning Act 129 repeatedly speaks in permissive language. For example, it provides: "Act 129 of 2008 provides Pennsylvania electric utility consumers ***opportunities*** to take energy efficiency and conservation to the next level." "Energy Efficiency & Conservation Information for your Home," http://www.puc.state.pa.us/General/consumer_ed/pdf/EEC_Home-FS.pdf (last visited October 7, 2020) (emphasis added). "In creating [energy efficiency and conservation programs (EE&C)], the [PUC] recognized ***a 'one-size-fits-all' approach would not be the best*** approach. The [PUC] ***balances the needs of consumers*** with those of the [electric distribution companies (EDCs)]. . . ." *Id.* (emphasis added). "The PUC's program standards provided each EDC with the ability to tailor its energy efficiency and conservation plan to its service territory and consumers." *Id.* The EDCs' plans include "***incentive programs***" to "***encourage***" residential consumers to purchase energy-efficient products. *Id.* (emphasis added). EDCs must provide consumers with specific information "on the money-saving EE&C programs ***available*** to them because of Act 129. *Id.* (emphasis added). These programs are ***designed to help consumers*** use electricity efficiently, curb

12

consumption and reduce overall demand for electricity. Many of these programs include subsidies from the EDC to *encourage* the use and employment of energy efficiency measures." *Id.* (emphasis added).

Moreover, nothing in the language of Act 129 appears to preclude either PECO or the PUC from granting an accommodation to a customer who desires to avoid RF emissions from a wireless smart meter. In *Benlian v. PECO Energy Corp.* (E.D. Pa., No. 15-1218, filed July 20, 2016), 2016 U.S. Dist. LEXIS 95082, for example, PECO installed a smart meter on a pole some distance from the plaintiff's home in accommodation of his claim that the prior installation of the meter on his home had caused new or exacerbated health problems. *Id.*, slip op. at __, 2016 U.S. Dist. LEXIS 95082, at *10.

Thus, although Act 129 does appear to anticipate installation of smart meters on customers' premises, nothing in the language of Act 129 facially *requires* every customer to endure involuntary exposure to RF emissions from a smart meter. Rather, the language of Act 129 seems calculated to support customer *choice* in the use of smart meter technology. Therefore, we conclude that Act 129 does not preclude either PECO or the PUC from accommodating a customer's request to have RF emissions from that customer's meter turned off, to have a smart meter relocated to a point remote from the customer's house, or some other reasonable accommodation. We reverse that portion of the PUC's decisions finding it lacked authority for accommodations of customers' requests to avoid RF emissions. We remand to the PUC to allow consideration of Consumers' requests for accommodations, and determination of what, if any, accommodations are appropriate, in light of this Court's conclusion that Act 129 does not forbid such accommodations.

13

## C. Burden of Proof – Conjunctive vs. Disjunctive

Consumers argue they are not seeking relief in the form of a system-wide "opt-out" provision based merely on their "preference," but rather, an administrative remedy for a proven violation of the safety and reasonableness requirement of Section 1501 of the Public Utility Code, 66 Pa. C.S. § 1501 (Section 1501),[12] in their individual cases. They insist that nothing in Act 129 limits the Commission's authority to grant such relief.

Consumers assert that because the law requires electricity service to be both reasonable and safe, the PUC erred in requiring Consumers to prove that requiring wireless meters in their homes would be both unreasonable and unsafe in order to establish a violation of Section 1501. That is, because the statute requires, in the conjunctive, both safety and reasonableness, Consumers could disprove either, in the disjunctive, to prove a violation. Therefore, the PUC erred in requiring Consumers to prove "conclusively" that wireless smart meters would cause medical harm, *i.e.*, lack of safety, while ignoring whether requiring wireless smart meters would be unreasonable under all the circumstances, regardless of whether medical harm was shown. Consumers assert that requiring wireless smart meters in their homes is unsafe and unreasonable, but those are alternative arguments.

The PUC's position on the burden of proof issue is inconsistent. At one point, the PUC appears to concede the correctness of Consumers' position. The PUC states the ALJ's role is to determine whether "'use of a smart meter . . . will constitute unsafe *or* unreasonable service . . . .'" *Povacz* (Pa. P.U.C., No. C-2015-2475023,

---

[12] "Every public utility shall furnish and maintain adequate, efficient, *safe, and reasonable service* and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public . . . ." 66 Pa. C.S. § 1501 (emphasis added).

14

filed Mar. 28, 2019), slip op. at 15 (quoting *Kreider v. PECO Energy Co.* (Pa. P.U.C., No. P-2015-2495064, filed Jan. 28, 2016), slip op. at 21-23) (emphasis added).

Elsewhere in its opinion, however, the PUC posits that Consumers "must prove, by a preponderance of the evidence, that [their] exposure to the RF fields from the wireless smart meter that PECO plans to install . . . will 'exacerbate' or 'adversely affect' [their] health and, therefore, constitute unsafe *and* unreasonable service . . . ." *Povacz* (Pa. P.U.C., No. C-2015-2475023, filed Mar. 28, 2019), slip op. at 27 (emphasis added).

We infer from its inconsistent language that the PUC did not recognize this distinction in the context of Consumers' claims. In fact, a review of the PUC's decision does not indicate whether the distinction was significant to the PUC's reasoning. The PUC's decision does not clearly purport to require Consumers to prove the meter installation is both unsafe and unreasonable as applied to them. However, Consumers are logically correct that because PECO has a mandate to provide safe *and* reasonable service, Consumers may establish a violation of that mandate by showing the wireless smart meter requirement is either unsafe *or* unreasonable.

To the extent, if any, that the PUC applied a conjunctive burden of proof, we vacate and remand its decision for reconsideration expressly applying the correct disjunctive burden of proof.

### D. Reasonableness of Mandatory Installations

Next, Consumers contend they established that mandatory installations of wireless smart meters in their homes would be unreasonable under the circumstances as to all of the individual Consumers. They contend RF is unquestionably a physical

15

force, and mandating exposure is unreasonable in light of Consumers' sincere concerns, supported by their medical experts and an expert witness concerning RF, and in the absence of some compelling reason to mandate their exposure.

Consumers assert that neither the PUC nor PECO identified any compelling reason to impose wireless smart meters on every customer without exceptions for health or safety considerations. PECO and the PUC simply assert – incorrectly, according to Consumers – that Act 129 compels it.

Moreover, Consumers insist their concerns are reasonable in light of their health conditions and their doctors' recommendations, and demonstrably sincere in light of the comprehensive, lengthy, and expensive actions they have undertaken in order to minimize their RF exposure. Finally, they contend that scientific studies, including comprehensive government studies, even if not yet universally accepted, support the reasonableness of Consumers' concerns about the health risks of RF exposure, as well as the safety hazards of installing wireless smart meters that create such exposure.[13]

---

[13] Evidence presented before the ALJ indicated the RF emissions from wireless smart meters are less than 1% of the level adjudged safe by the Federal Communications Commission (FCC), and moving a wireless smart meter 20 feet from a home would reduce even that minute level of emission by an additional 99%. Consumers respond that the FCC relies on outdated studies and that a safe level of exposure to RF emissions is actually exponentially lower than the level approved decades ago by the FCC.

In that regard, we note that on January 9, 2020, the PUC filed a letter notice, pursuant to Pa. R.A.P. 2501(b), of an order entered by the FCC on November 27, 2019, declining to propose amendments to its existing limits on RF emissions. The FCC's order is available on its website: https://www.fcc.gov/document/fcc-maintains-current-rf-exposure-safety-standards (last visited October 7, 2020).

Consumers filed applications for relief pursuant to Pa. R.A.P. 123 in the form of motions to strike the PUC's letter notice. Consumers asserted the notice did not relate to new legal authority, as contemplated by Rule 2501(b), because the FCC's RF emission limits were referenced only as part of the background facts of this case. The PUC responded that the FCC standards have the force of law and that Rule 2501(b) mandated the letter notice by the PUC.

16

As discussed above, the PUC's position that Act 129 requires installation of wireless smart meters in all consumer residences is incorrect. Accordingly, the PUC is also incorrect in finding that PECO may not or need not offer any accommodation to Consumers.

Because this portion of the PUC's decision is dependent on its erroneous conclusion that Act 129 does not allow accommodations, we vacate this portion of the PUC's decision and remand for further consideration.

However, as discussed in the next section, we affirm the PUC's application of the correct burden of proof concerning the risk of harm from RF emissions. Therefore, in considering accommodations to Consumers on remand, the PUC should consider whether accommodations are appropriate *without* proof of harm, so that Consumers may choose to avoid RF emissions from wireless smart meters, while allowing PECO to comply with Act 129's mandate concerning availability of smart meter technology.

The question here is much murkier than simply stating the correct burden of proof. What is the proper course when RF emissions *do have known dangers*, but research has not yet determined the extent of those dangers? Should Consumers bear the risk that RF emissions are more harmful to them than to others because of their sensitivity and underlying health conditions? Conversely, should PECO be required to accommodate Consumers' fears even though medical research has not yet definitively determined the degree of risk posed by the level of RF exposure at issue?

---

This Court directed submission of the applications for relief and any responses thereto along with the merits of Consumers' petitions for review. In our disposition of the petitions for review, we have not relied on either the FCC standards or the FCC's recent order declining to propose amendments to those standards. We therefore dismiss the applications for relief as moot.

17

Logic, safety concerns, and fairness require some balancing of the parties' interests. Consumers argue the burden to PECO of accommodating their desire to avoid RF emissions is minimal, and they claim they are willing to pay any additional cost of the accommodations.

The record does not contain evidence from PECO that it would incur any extreme costs by accommodating Consumers' desires to avoid RF emissions in three homes in PECO's service area. Even if Consumers obtain the relief they seek, it is difficult to imagine that large numbers of other PECO customers will then flood the utility with requests to avoid RF emissions at increased cost. Thus, even though the actual risk to Consumers' health is uncertain, their suggestion that the burden to them of forced exposure to additional RF emissions outweighs any minimal burden to PECO is well taken.

Consumers argue that wired smart meters exist. They also suggest that if wireless meters must be installed, turning off the emissions upon a customer's request should be allowed. Notably, in *Naperville Smart Meter Awareness v. City of Naperville* (N.D. Ill., No. 11 C 9299, filed Mar. 22, 2013), U.S. Dist. LEXIS 40432 (*Naperville I*), a city ordinance concerning installation of smart meters allowed customers with health concerns to have the meters' RF emissions turned off. Here, the PUC and PECO offer no such option. Further, the parties' briefs do not offer any substantial discussion of the viability of the option of allowing RF emissions to be turned off.

The PUC should consider all these issues on remand.

### E. Burden of Proof – Conclusive vs. Potential Harm

Consumers' next theory of recovery asserts that the PUC erred in requiring them to prove a "conclusive causal connection" between RF exposure and adverse

human health effects. They argue the PUC should have considered the *potential* for harm, rather than imposing a tort-like burden of proving causation. They insist safety includes freedom from *risk* of harm, not merely freedom from the harm itself. They suggest the plain language of Section 1501 requires neither proof of actual harm nor proof of proximate causation in order to show lack of safety.

PECO argues Consumers had to prove by a preponderance of the evidence that exposing them to RF from smart meters would cause, contribute to, or exacerbate their health conditions. Consumers failed to meet this standard of proof. Consumers' proposed standard of proof would essentially shift the burden of proof to PECO to show the smart meters could not harm Consumers. PECO has spent $750 million to install the smart meter system throughout its territory as required by Act 129 and the PUC, and Consumers' standard of proof would effectively convey veto power over the system to any customer with a sincere belief that there was any risk of harm. Moreover, the PUC already articulated the standard of proof, *i.e.*, that a customer complainant alleging adverse health effects must prove "a conclusive causal connection" between RF exposure and those adverse health effects – a burden that cannot be satisfied by research and studies that are inconclusive.[14]

The PUC found the ALJ correctly imposed a burden of proof requiring Consumers to demonstrate adverse health effects by a preponderance of the

---

[14] PECO cites: *Kreider*; *Letter of Notification of Philadelphia Electric Company Relative to the Reconstructing and Rebuilding of the Existing 138 kV Line to Operate as the Woodbourne-Heaton 230 kV Line in Montgomery and Bucks Counties* (Pa. P.U.C., No. A-110550F0055, filed Mar. 26, 1993), slip op. at __, 1992 Pa. P.U.C., Lexis 160, at \*7-\*8; *Letter of Notification of Philadelphia Electric Company Relative to the Reconstructing and Rebuilding of the Existing 138 kV Line to Operate as the Woodbourne-Heaton 230 kV Line in Montgomery and Bucks Counties* (Pa. P.U.C., No. 110550F0055, filed Nov. 12, 1993), 1993 WL 855896. **Notably, these authorities are at least 27 years old, and any research on which they relied is necessarily even older**, a fact which tends to lend support to Consumers' point that PECO and its expert witness relied on outdated information concerning the danger from RF emissions.

evidence. This required Consumers to prove that there was a "conclusive causal connection" between RF exposure from smart meters and adverse human health effects.

The PUC concedes Consumers were not required to prove harm had actually occurred; the PUC's authority extends to claims seeking to prevent harm. However, where prevention of harm was Consumers' aim, the burden of proof still required demonstration by a preponderance of the evidence that the utility's proposed conduct would create a "proven exposure to harm." *Povacz* (Pa. P.U.C., No. C-2015-2475023, filed Mar. 28, 2019), slip op. at 29. The PUC argues that although the occurrence of harm need not be certain, or even probable, Consumers incorrectly equated any hazard, however slight, with exposure to harm. The *Naperville I* court considered this issue and found that even without an option to deactivate the radio transmitters in the smart meters, the plaintiffs' claim would not have been viable. Like Consumers here, the *Naperville I* plaintiffs based their claim on "a theory that the radio waves emitted from the smart meters, together with other RF-wave-emitting devices in the environment, have the ***potential*** to be harmful." *Id.*, slip op. at __, 2013 U.S. Dist. LEXIS 40432, at *28-*29 (emphasis added). The court in *Naperville I* acknowledged the plaintiffs' contention that "certain doctors believe that over time the public's cumulative exposure to low-level RF from devices such as cell phones, radio towers, and smart meters ***may*** pose health risks, such that more accurate guidelines and standards regarding the safety of RF exposure are necessary." *Id.*, slip op. at __, 2013 U.S. Dist. LEXIS 40432, at *29 (emphasis added). Nonetheless, the court concluded "[t]he bare allegation that it is unknown whether [p]laintiffs are actually being harmed by the level of RF waves emitted from one smart meter is insufficient" to raise a claim for relief that is more than

20

speculative. *Id.*, slip op. at __, 2013 U.S. Dist. LEXIS 40432, at *29 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The reasoning of *Naperville I* concerning the applicable burden of proof is persuasive. We therefore affirm the burden applied by the PUC concerning proof of harm from RF emissions.

However, as discussed above, the PUC appears to have based its decision largely on its conclusion that Act 129 mandated installation of wireless smart meters on every residence and did not permit the PUC to grant *any* form of relief to Consumers to accommodate their desire to avoid RF emissions. On remand, the PUC should consider whether reasonable accommodations should be provided in light of the conclusion that Act 129 does not preclude such accommodations of customers' health concerns, regardless of proof of harm.

### F. Risk of Harm – Sufficiency of Evidence

Finally, Consumers insist the correct burden of proof would compel the PUC to find the use of wireless smart meters would be unsafe for the individual Consumers. They also argue their evidence demonstrated a risk of harm, and the PUC should not have disregarded that evidence, including the testimony of Consumers' expert witness and the federal government study on which that witness relied. Consumers further contend the PUC should not have relied on the testimony of PECO's expert that "conclusive" proof of harm is impossible; rather, the correct standard was whether there was proof of a *risk* of harm. Further, Consumers assert PECO's expert relied on outdated FCC findings from 1986;[15] the study cited by Consumers' expert is the most recent study and should not have been disregarded by either PECO or the PUC.

---

[15] *See* discussion in note 13 above.

21

This argument is closely related to the previous argument. To the extent Consumers are arguing there was not substantial evidence to support the PUC's decision, this Court will not revisit the PUC's findings of fact. To the extent Consumers contend the burden of proof should have been different, that issue is addressed in the previous section. We affirm the PUC's findings of fact as based on substantial evidence.

## IV. Conclusion

Based on the foregoing discussion, we affirm the PUC's rejection of Consumers' constitutional challenge. We reverse the PUC's conclusion that it lacks authority to accommodate Consumers' desire to avoid RF emissions from smart meters and vacate the PUC's determination that such accommodation would not be reasonable. We affirm the PUC's determination of the burden of proving harm. We affirm the PUC's findings of fact. We remand this matter to the PUC for determinations of whether accommodations are appropriate for each of the Consumers, and if so, what those accommodations should be. On remand, the PUC should consider all reasonable accommodations, including, but not limited to, deactivation of the RF emitting functions of the smart meters; installation of the smart meters at locations remote from Consumers' homes; and installation of wired rather than wireless smart meters, if (as Consumers contend) such technology is available.

_____
ELLEN CEISLER, Judge

Judge Covey did not participate in the decision of this case.

22

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Maria Povacz, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 492 C.D. 2019 |
| | : | |
| Pennsylvania Public Utility | : | |
| Commission, | : | |
| Respondent | : | |
| | | |
| Laura Sunstein Murphy, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 606 C.D. 2019 |
| | : | |
| Pennsylvania Public Utility | : | |
| Commission, | : | |
| Respondent | : | |
| | | |
| Cynthia Randall and Paul Albrecht, | : | |
| Petitioners | : | |
| | : | |
| v. | : | No. 607 C.D. 2019 |
| | : | |
| Pennsylvania Public Utility | : | |
| Commission, | : | |
| Respondent | : | |

# **O R D E R**

AND NOW, this 8th day of October, 2020, the orders of the Pennsylvania Public Utility Commission (PUC) are AFFIRMED in part, REVERSED in part, and VACATED in part, as follows:

1.  The PUC's rejection of the constitutional challenge of Maria Povacz, Laura Sunstein Murphy, Cynthia Randall, and Paul Albrecht (jointly, Consumers) is AFFIRMED.

2. The PUC's conclusion that it lacks authority to accommodate Consumers' desire to avoid radiofrequency (RF) emissions from smart meters is REVERSED. This matter is REMANDED to the PUC for consideration of Consumers' requests for accommodations and determinations of what, if any, accommodations are appropriate for each individual Consumer. The PUC on remand may consider all reasonable accommodations, including deactivation of the RF emitting functions of smart meters at Consumers' homes; installation of the smart meters at locations remote from Consumers' homes; or installation of wired rather than wireless smart meters, if (as Consumers contend) such technology is available.

3. The PUC's determination that Consumers' requested accommodations would not be reasonable is VACATED, and this matter is REMANDED for application of the correct burden of proof. On remand, Consumers need not prove that mandatory installation of smart meters is both unsafe and unreasonable; rather, Consumers need only prove that mandatory installation of smart meters is either unsafe or unreasonable.

4. The PUC's determination that Consumers failed to meet their burden to prove unreasonableness is VACATED. Because the PUC's determination was based on its conclusion that the 2008 amendment to the Public Utility Code, known as Act 129, Act of October 15, 2008, P.L. 1592, 66 Pa. C.S. § 2807, does not allow accommodations, this issue is REMANDED for further consideration. Further, on remand, the PUC should balance the parties' interests and

consider whether refusal of accommodations was unreasonable without proof of actual harm to Consumers.

5. The PUC's determination that in order to prove lack of safety of the smart meters (as opposed to lack of reasonableness in refusal of accommodations by PECO Energy Company (formerly the Philadelphia Electric Company)), Consumers had to show a conclusive causal connection between RF exposure and adverse health effects is AFFIRMED.

6. The PUC's findings of fact on the safety of smart meters are AFFIRMED.

Consumers' applications for relief in the form of motions to strike the PUC's letter notice of the Federal Communications Commission's November 27, 2019 order declining to propose amendment of its RF emission standards are DENIED as moot.

Jurisdiction is relinquished.

_____
ELLEN CEISLER, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Maria Povacz, :
            Petitioner :
                            :
    v.                      : No. 492 C.D. 2019
                            :
Pennsylvania Public Utility :
Commission, :
            Respondent :

Laura Sunstein Murphy, :
            Petitioner :
                            :
    v.                      : No. 606 C.D. 2019
                            :
Pennsylvania Public Utility :
Commission, :
            Respondent :

Cynthia Randall and Paul Albrecht, :
            Petitioners :
                            :
    v.                      : No. 607 C.D. 2019
                            : Argued:  June 10, 2020
Pennsylvania Public Utility :
Commission, :
            Respondent :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE ELLEN CEISLER, Judge
           HONORABLE J. ANDREW CROMPTON, Judge


CONCURRING AND
DISSENTING OPINION
BY JUDGE CROMPTON                    FILED:  October 8, 2020

Respectfully, I concur in part and dissent in part. I concur in the result to the extent the majority has determined (1) the Consumers'[1] constitutional rights were not violated, (2) the Public Utility Commission's (PUC) findings of fact regarding the safety of smart meters were based on the substantial competent evidence of record, (3) the PUC properly concluded the Consumers were required to show a conclusive causal connection between radio frequency (RF) exposure and adverse health effects, and (4) that the matter should be remanded to the PUC, albeit for a limited purpose as described herein. I do, however, diverge from the majority in its view that Act 129 (Act)[2] requires an electric distribution company to "furnish smart meter technology," per 66 Pa.C.S. §2807(f)(2)(iii), but does not necessarily require every customer to accept same.

Section 2807(f) of the Public Utility Code reads, in pertinent part, as follows:

> **(f) Smart meter technology and time of use rates.--**
> (1) Within nine months after the effective date of this paragraph, electric distribution companies shall file a smart meter technology procurement and installation plan with the commission for approval. The plan shall describe the smart meter technologies the electric distribution company proposes to install in accordance with paragraph (2).
> **(2) Electric distribution companies shall furnish smart meter technology as follows:**
> **(i) Upon request from a customer that agrees to pay the cost of the smart meter at the time of the request.**
> **(ii) In new building construction.**

---

[1] The Consumers in this matter are Petitioners Maria Povacz, Laura Sunstein Murphy, and Cynthia Randall and Paul Albrecht.

[2] 66 Pa.C.S. §2807.

**(iii) In accordance with a depreciation schedule not to exceed 15 years.**

(3) Electric distribution companies shall, with customer consent, make available direct meter access and electronic access to customer meter data to third parties, including electric generation suppliers and providers of conservation and load management services.

. . . .

(5) By January 1, 2010, or at the end of the applicable generation rate cap period, whichever is later, a default service provider shall submit to the [PUC] one or more proposed time-of-use rates and real-time price plans. The [PUC] shall approve or modify the time-of-use rates and real-time price plan within six months of submittal. The default service provider shall offer the time-of-use rates and real-time price plan to all customers that have been provided with smart meter technology under paragraph (2)(iii). Residential or commercial customers may elect to participate in time-of-use rates or real-time pricing.

. . . .

66 Pa.C.S. §2807(f) (emphasis added).

The majority interprets 66 Pa.C.S. §2807(f)(3) and (f)(5) to suggest an overall reading of the Act that does not comport with its plain meaning or well-established intent. Simply because customers are provided pricing options and control over the use of their meter data does not mean the installation of smart meters may be interpreted to be optional. If it was, the General Assembly would have said as much. Instead, the General Assembly chose the word "shall" in requiring electric distribution companies to furnish smart meter technology. At no point did the General Assembly add in the words "which the consumer may or may not choose to

accept," or other words to that effect, and it is not our role to read in such language now.[3]

The intent of the General Assembly was not ambiguous. Smart meters are mandatory in the Commonwealth. There is no opt-out provision. In the 12 years since the passage of Act 129, several utilities, including PECO (Intervenor), have invested substantial resources and relied on the certainty of the meaning of the Act to fulfill the State mandate. If the General Assembly had wished to provide an exception to the mandate, it could have done so in 2008, or in any year since that

---

[3] If the plain reading of the Act is not enough, I note here that, in 2008, when Governor Rendell announced the signing of the legislation into law, the following was reported:

> *Governor Edward G. Rendell*, Harrisburg, PA, U.S.A. — (METERING.COM) — October 16, 2008 – Pennsylvania's Energy Conservation Bill, including provisions for smart metering, was signed into law yesterday by state governor Edward G. Rendell.
>
> In terms of the bill, **state electric distributors are required to file their smart meter technology procurement and installation plan with the Public Utility Commission (PUC) within nine months. Within 15 years all homes and businesses in the state are to be equipped with smart meters.**
>
> Energy saving targets that have been set includes cuts of 1 percent by 2011 and 3 percent by 2013, as well as a 4.5 percent reduction of peak demand by 2013. **Utilities that fail to meet these requirements will face steep penalties**.

(Emphasis added.) *See* https://www.smart-energy.com/regional-news/north-america/pennsylvania-energy-bill-signed/ (last visited on October 7, 2020).

JAC - 4

time.  However, it has not, and it is not this Court's role to create an opt-out provision where none exists statutorily.[4]

This does not mean, however, that the Consumers should not have an opportunity to request accommodation.  Section 1501 states, in pertinent part, that "[e]very public utility shall furnish and maintain adequate, efficient, **safe, and reasonable service** and facilities." 66 Pa.C.S. §1501 (emphasis added).  I agree with the majority's position that the Consumers were not required to prove that the use of smart meters is both unreasonable *and* unsafe.  In other words, it is an either-or proposition.  The Consumers would have to demonstrate only that the smart meter was either unsafe *or* unreasonable as provided to them to show a violation of the mandate, not that the smart meter is both unsafe *and* unreasonable.  The majority writes:

> The PUC states the [Administrative Law Judge (ALJ)] ALJ's role is to determine whether "'use of a smart meter . . . will constitute unsafe *or* unreasonable service . . . .'" *Povacz v. PECO Energy Co.*, (Pa. P.U.C. No. C-2015-2475023, filed Mar. 28, 2019), slip op. at 15 (quoting *Kreider v. PECO Energy Co.*, (Pa. P.U.C. No. P-2015-2495064, filed Jan. 28, 2019), slip op. at 21-23 (emphasis added).  Elsewhere in its opinion, however, the PUC posits that [the] Consumers "must prove, by a

---

[4] In an August 20, 2019 article from the National Conference of State Legislatures (NCSL) titled "Smart Meter Opt-Out Policies," NCSL provides an overview of state laws governing the use of smart meters.  In each of the states that had smart meter laws as of August 20, 2019, many had some kind of opt-out or opt-in provision.  However, in each state where options were offered, they were offered through statute or regulation, at the option of the utility, or as required by the state's public utility commission or similar entity.  I have seen no evidence that the options were imposed by the courts, and I do not believe we should do so here in Pennsylvania.  Daniel Shea and Kate Bell, *Smart Meter Opt-Out Policies*, https://www.ncsl.org/research/energy/smart-meter-opt-out-policies.aspx (last visited on October 7, 2020).

preponderance of the evidence, that [their] exposure to the RF fields from the wireless smart meter that PECO plans to install. . . will 'exacerbate' or 'adversely affect' [their] health and, therefore, constitute unsafe **and** unreasonable service . . . ." *Povacz*, slip op. at 27 (emphasis added). We infer from its inconsistent language that the PUC did not recognize this distinction in the context of [the] Consumers' claims. In fact, a review of the PUC's decision does not indicate whether the distinction was significant to the PUC's reasoning. The PUC's decision does not clearly purport to require [the] Consumers to prove the meter installation is both unsafe and unreasonable as applied to them. However, [the] Consumers are logically correct that because PECO has a mandate to provide safe **and** reasonable service, [the] Consumers may establish a violation of that mandate by showing the wireless smart meter requirement is either unsafe **or** unreasonable.

*Povacz v. Pa. Pub. Util. Comm'n* (Pa. Cmwlth. No. 492 C.D. 2019, filed October 8, 2020), slip op. at 14.

The majority focuses on the PUC's *Povacz* opinion to suggest that the PUC may have incorrectly applied "a conjunctive burden of proof," rather than a "disjunctive burden of proof." It is, however, unclear in this matter whether the PUC applied the correct standard and merely stated it incorrectly in its opinion or whether the wrong standard was in fact applied. Interestingly, the PUC's Administrative Law Judge's (ALJ) decisions in the two companion cases (*i.e.*, *Murphy v. Public Utility Commission* and *Randall and Albrecht v. Public Utility Commission*, as identified in the caption above), clearly enunciated, as conclusions of law, that utility companies are required to furnish safe and reasonable service and that, in the case of *Murphy*, there was "no evidence that a PECO smart meter was unsafe *or* unreasonable." Reproduced Record (R.R.) at 87a-120a; *Murphy v. PECO Energy Co.* (Pa. P.U.C. No. C-2015-2475726, filed Feb. 21, 2018) (emphasis added). In the *Randall and Albrecht* matter, the ALJ determined that the consumers had not met

their burden of showing a violation of the Public Utility Code,[5] which includes the requirement to demonstrate the smart meter was unsafe *or* unreasonable. R.R. at 121a-45a; *Randall and Albrecht v. PECO Energy Co.* (Pa. P.U.C. No. C-2016-2537666, filed Feb. 21, 2018) (emphasis added). Further, in the very *Povacz* opinion referenced by the majority, and as noted above, the PUC stated:

> In reaching our conclusion in *Kreider[, Kreider v. PECO Energy Co.*, (Pa. P.U.C. No. P-2015-2495064, filed Jan. 28, 2019] that we could hear and adjudicate a complainant's allegation(s) of unsafe service and facilities related to a . . . smart meter, we did not modify the standard or burden of proof that applies to a complainant in a formal complaint proceeding under Section 1501 before the [PUC] . . . .
>
> Because the complainant in that case had alleged that her health was "adversely affected" by the smart meter installed outside of her bedroom and that PECO's use of a smart meter would violate Code § 1501, **we explained that it would be the role of the ALJ to determine** whether there is sufficient evidence to support a finding that **the [c]omplainant was adversely affected by the smart meter or whether PECO's use of a smart meter** to measure this [c]omplainant's usage **would constitute unsafe *or* unreasonable service in violation of Section 1501 under the circumstances in that case. Those statements appearing in *Kreider*, in our opinion, are an accurate summary of applicable law . . . .**

*Povacz v. PECO Energy Co.* (Pa. P.U.C. No. C-2015-2475023, filed Mar. 28, 2019) (2019 *Povacz* Order), slip op., at 26-27 (emphasis added).

This statement suggests that perhaps the PUC was not confused about the standard by which it should measure whether the smart meter fulfills the requirement of Section 1501. Nonetheless, because it is unclear in the instant matter,

---

[5] 66 Pa.C.S. §§101-3316.

JAC - 7

and the PUC may have utilized a conjunctive burden of proof, improperly requiring the Consumers to prove that the smart meters are both unsafe *and* unreasonable, I would remand for the PUC to re-examine the existing record to ensure application of the correct standard without taking additional evidence.

While I maintain that Section 1501 must be given its due weight and the *utility*, in this case PECO, is mandated by the Act to provide a smart meter to each of its customers, there is no language in the Act that precludes the PUC from directing the utility to explore a reasonable alternative where a customer successfully demonstrates the smart meter is unsafe or unreasonable.

I disagree with the majority's suggestion that the PUC determined the Consumers failed to meet their burden of proving unreasonableness based on the erroneous conclusion that Act 129 does not allow accommodations. While the statute does not provide an opt-out provision, and the utility is required to provide smart meters thereunder, there is nothing in the statute that suggests an accommodation cannot be provided when the provision to the individual is either unsafe or unreasonable. The Consumers here properly sought relief under Section 1501 of the Public Utility Code, 66 Pa.C.S. §1501, arguing for an alternative to smart meters on the grounds that the meters were either unsafe or unreasonable in their particular circumstances. Here, the Consumers, in light of their respective medical conditions, rightly focused on the safety of the meters. While I do not think that the Consumers should be permitted to re-litigate the issue of safety and reasonableness, I believe the Consumers are entitled to have the PUC review the existing record to

determine whether it reflects that the installation of a smart meter is, or would be, unsafe *or* unreasonable, per Section 1501.

For the foregoing reasons, I would affirm the PUC's order, in part, but remand solely for the PUC to review the existing record to determine whether it applied the correct standard, as addressed above, and to issue a new decision and order accordingly.

_____
J. ANDREW CROMPTON, Judge

Judge Fizzano Cannon joins in this concurring and dissenting opinion.